# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Goins*, 2013 IL App (1st) 113201

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRECE GOINS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3201 |
| Filed | October 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a verdict convicting defendant of aggravated battery of a child and acquitting him of attempted first degree murder, the appellate court held that the finding that he voluntarily, intelligently, and knowingly waived his *Miranda* rights was not against the manifest weight of the evidence, despite his limited mental capacity, the testimony of defendant's psychologist was properly limited, and the testimony of a prosecution expert did not deprive defendant of a fair trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-1944; the Hon. Clayton J. Crane, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Kathleen A. Hill, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (William Toffenetti and Margaret Lustag, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.

Justices Pucinski and Mason concurred in the judgment and opinion.

## OPINION

¶ 1    A jury convicted defendant Tyrece Goins of aggravated battery of a child and acquitted him of attempted first degree murder. Goins was sentenced to 11 years in prison. Before trial, Goins filed a motion to suppress a statement made to a detective and an assistant State's Attorney during his interrogation. He contends that he had not "voluntarily, knowingly and intelligently" waived his *Miranda* rights before making the statement because his "mental, educational, emotional and/or psychological state, capacity and condition" prevented him from fully understanding those rights. After hearing testimony from three experts (one retained by the State and two by the defense), Goins' mother, Goins, and the detective and assistant State's Attorney who interrogated Goins, the trial court denied the motion, finding that Goins knowingly and intelligently waived his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 2    The matter proceeded to a jury trial, where the State introduced Goins' statement as evidence. The State also presented testimony from the detective and assistant State's Attorney regarding their taking defendant's statement, testimony from Goins' mother concerning Goins' ability to care for his young son and to live independently despite his learning disabilities, and testimony from medical experts about the victim's injuries.

¶ 3    After trial, Goins sought a new trial, asserting that the trial court made several erroneous rulings, including: denying his motion to suppress his statement; limiting Goins' expert's testimony to matters relating to Goins' IQ score; and denying his motion for a mistrial when the State's witness made reference to a scar on the victim and the long-term effects of the victim's injuries. The motion for a new trial also alleged that the State made improper and inflammatory remarks during closing and rebuttal arguments. The trial court denied Goins' motion for a new trial.

¶ 4    In this appeal, Goins argues that the trial court erred in (1) denying the motion to suppress his statement where the evidence did not establish that he knowingly and intelligently waived his *Miranda* rights, owing to his limited mental capacity inhibiting full

-2-

understanding of the meaning of his rights; (2) limiting his expert's testimony to information concerning Goins' IQ score; (3) denying his motion for a mistrial where the State's expert testified about a scar on the victim and the long-term effects of the victim's injuries; and (4) denying his motion for a new trial where the State made improper remarks during closing and rebuttal arguments. We disagree and affirm.

¶ 5 We find defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, where considering the totality of circumstances, including defendant's limited mental capacity, the trial court's finding on this issue was not against the manifest weight of the evidence. Also, we find the trial court properly limited defendant's expert testimony to factors relating to defendant's limited mental capacity and did not deprive defendant of a fair trial based on testimony by the State's expert witness or remarks by the prosecutor during closing and rebuttal arguments.

¶ 6 BACKGROUND

¶ 7 The Taking of the Statement

¶ 8 On January 28, 2008, the State charged Goins by indictment with attempted first degree murder and aggravated battery of a child stemming from injuries sustained by his two-year-old son, Wanya, on December 31, 2007. At the time of the incident, Goins believed that Wanya was his son from a previous relationship. (Later, Goins learned that he was not Wanya's biological father.) Wanya lived with Goins and his girlfriend, Alexandra Smith, in Springfield, Illinois, where Goins was enrolled in a GED program at Lincoln Land Community College.

¶ 9 In December 2007, Goins, Smith, and Wanya visited the Chicago area to celebrate the holidays. Smith returned to Springfield shortly after December 25, 2007; Goins and Wanya remained in Chicago. On December 31, Goins and Wanya were staying at the apartment of Goins' mother, Veronica Goins, and Goins' sister, Donna Goins. On that evening, Goins was home alone with Wanya.

¶ 10 On the morning of January 1, 2008, Goins' mother and sister returned home and noticed that something was wrong with Wanya. The child was moaning. His eyes were rolled into the back of his head. And he would not stand unassisted. Goins' mother called the paramedics and Wanya was taken to Comer Children's Hospital. Due to Wanya's young age, a child abuse team was assigned to evaluate his case and hospital staff contacted the police. The doctors determined Wanya suffered extensive injuries, including severe brain injury, hemorrhages in his brain and retinas, as well as bruises on his forehead and blood inside his ear canal. Wanya's injuries required putting a drain in his head to evacuate excess fluid and blood accumulating on his brain and a cervical collar to stabilize his neck. Also, Wanya was attached to IV tubes containing various medications to keep him stable and treat seizures.

¶ 11 On January 2, 2008, Chicago police detective David Matual interviewed Goins at the hospital. Goins told Detective Matual that at the time of the incident, he had gone to the washroom while Wanya played on the bed. When he returned from the washroom, Wanya had fallen off of the bed and was screaming. Goins did not immediately call 911, but his mother called an ambulance the following morning. Detective Matual informed Goins that

he was under arrest and read Goins his *Miranda* rights. After Goins requested that an assistant State's Attorney (ASA) be present for the interview, Detective Matual brought ASA Marina Para into the interview room. ASA Para advised Goins of his *Miranda* rights, then transcribed a statement from Goins by hand on a preprinted form used for taking statements. The form contained a paragraph advising Goins of his *Miranda* rights. The handwritten statement summarized the events that took place on December 31, 2007, leading up to Wanya's injuries.

¶ 12    In the statement, Goins explained that on December 31, 2007, he and Wanya, whose nickname is "Tank," were staying at his mother's apartment. Goins and Wanya were home alone. His mother was working and his sister went out with friends. At about 8 p.m., Goins and Wanya were watching television when Goins' father called on the landline telephone. Goins' father told Goins that his two-year-old brother passed away that day. Goins stated that the news made him "sad, upset, and frustrated so he threw the phone and it hit a chair and the back piece came off and he put it back on." From that point on, Goins stated that the telephone cut in and out for the rest of the night.

¶ 13    Shortly before 9 p.m., Goins took Wanya upstairs to the bedroom to watch television while sitting on the bed. "Angry, upset, sad, crying, and frustrated," with "no one home for him to talk to about how he felt," Goins was "putting his fists on the side of his face and was moving his arms around and was acting more than just crazy because he was so upset." Goins was "hollering" and used his right hand to hit Wanya's head "pretty hard" on the right side. Goins then saw Wanya's head hit the wall. Wanya fell backwards on the bed, and was "screaming very loudly and at a high pitch, which is not how he normally crie[d]." Goins observed that Wanya "was not the same as before [Goins] hit him." Goins picked up Wanya and shook him to see what was wrong with him. Goins saw that Wanya's head was falling to the side and his eyes were rolling back in his head and would not stay open. Wanya could not stand on his own, and his arms were limp. Wanya also began vomiting repeatedly.

¶ 14    Goins said he "was feeling terrible because he had just hurt his son." Goins then called his girlfriend in Springfield and told her that Wanya had fallen off the bed because he was afraid to tell the truth. While Goins was speaking with his girlfriend, the telephone cut out. Goins then called his mother and left her a message. When she returned his call, Goins told her that Wanya had fallen off the bed because he was also scared to tell her the truth. His mother advised Goins to try to keep Wanya awake, but Wanya could not keep his eyes open or his head up. Wanya continued to cry and scream all night. Goins "did not call the police or 911 all night because he was scared and he was the person who hit [Wanya]."

¶ 15    The next morning, around 10 or 11 a.m., Goins' mother arrived home. She tried to wake Wanya and called 911. Because he was still scared, Goins again told his mother that Wanya had fallen off the bed while he was in the washroom. The ambulance arrived and took Wanya to the hospital. Goins did not tell anyone what he did to Wanya until his statement to ASA Para.

¶ 16    On September 15, 2008, Goins filed an amended motion to suppress the statement he made to ASA Para. The motion alleged that Goins did not voluntarily, knowingly, and intelligently waive his *Miranda* rights where his mental deficiencies made him "incapable

-4-

and unable to appreciate and understand the full meaning of his *Miranda* rights."

¶ 17                        Hearing on Motion to Suppress

¶ 18         On November 18, 2009, the trial court held a hearing on Goins' motion to suppress his statement. Goins presented testimony from two doctors who worked at Forensic Clinical Services. Dr. Fidel Echevarria testified that he examined Goins on January 27, 2009. Dr. Echevarria concluded that Goins was fit to stand trial, but deferred his evaluation on the issue of whether Goins had the ability to understand *Miranda* warnings. Dr. Echevarria referred Goins to the psychology department for IQ and other cognitive testing. Dr. Echevarria testified that Dr. Eric Neu conducted psychological testing and submitted a report. Dr. Neu's report found that Goins had an IQ of 61, and diagnosed Goins with mild mental retardation. Dr. Echevarria explained that Goins had the ability to read, but had a delay and difficulty understanding certain words. Dr. Echevarria testified that nothing indicated that Goins was malingering. Based on Dr. Neu's report and his own examination, Dr. Echevarria concluded that Goins did not have the ability to understand his *Miranda* rights at the time of his statement.

¶ 19         Dr. Echevarria testified that during his examination, he asked Goins what each *Miranda* right meant. When asked what the right to remain silent meant, Goins responded, "I guess you could choose to stay quiet or talk." Dr. Echevarria testified that it would be fair to say that Goins understood the right to remain silent. When Dr. Echevarria asked Goins about the *Miranda* warning that anything you say can be used against you later in court, Goins explained, "I guess if you give a statement that the State's Attorney can use as evidence of what you told them." Dr. Echevarria testified that Goins' response was an accurate understanding of that *Miranda* right.

¶ 20         Dr. Echevarria asked Goins about the right to consult an attorney, whether Goins was able to financially afford one or not, and Goins replied, "Well, an attorney is a lawyer so I'm [not] sure what consult, that word is, but I guess it means talk to them. This thing about not having money means that you can get a PD." Dr. Echevarria testified that in his opinion, Goins provided an accurate understanding of that *Miranda* right. When asked about the right to consult an attorney before, and have an attorney present during, questioning, Goins responded, "[T]hat's a little confusing, it sounds like you can have the lawyer in the room with you when police ask questions." In Dr. Echevarria opinion, Goins' response indicated an accurate understanding of the right to have an attorney present during questioning. Despite Goins' accurate understanding of his *Miranda* rights at the time of his evaluation, Dr. Echevarria concluded that Goins would have been unable to understand his *Miranda* rights at the time of his statement.

¶ 21         Dr. Jonathan Kelly also testified on Goins' behalf. Dr. Kelly interviewed Goins twice, on September 30 and October 7, 2009. Dr. Kelly testified that he reviewed Goins' evaluation reports from Drs. Neu and Echevarria. Dr. Kelly's opinion was that Goins would not have had the ability to understand his *Miranda* rights when questioned by police. Dr. Kelly testified that he went over each of the *Miranda* warnings with Goins, and Goins was able to read each of the warnings out loud. When Dr. Kelly asked Goins the meaning of the right to

remain silent, Goins stated, "Don't know, it will use me in court?" Dr. Kelly asked Goins about the meaning of the warning "anything you say can and may be used against you in court or other proceedings," Goins responded, "They can use that against me in court, interrogation, the investigate[,] the officers, they can use the statement against me in court." After Dr. Kelly asked him the meaning of "the right to talk to a lawyer before we ask you any questions and to have him with you during questioning," Goins stated, "They ask me if I want to talk to them or to *** a lawyer. It say[s] I have the right to ask them questions or a lawyer. Do I want to talk to a lawyer before they ask me questions, have the lawyer with me during questioning?" Dr. Kelly found Goins' responses to be indicative of Goins' ability to understand his *Miranda* warnings at the time of Dr. Kelly's interview.

¶ 22      Dr. Kelly testified that Goins stated that he had never had any psychiatric hospitalizations or outpatient psychiatric treatment, and had never taken psychotropic medication. Dr. Kelly also questioned Goins about his adaptive functioning. Goins indicated that he was able to communicate using the telephone, do laundry, cook, and clean. Goins also told Dr. Kelly he had a driver's permit in the past, and was able to dial 911 in an emergency. Dr. Kelly opined that Goins was capable in the area of home living.

¶ 23      During cross-examination, Dr. Kelly testified that he was aware that Goins had met with other doctors and that Goins had not been cooperative with Dr. Susan Messina. Dr. Kelly read Dr. Messina's report, which stated that Goins "avoided direct answers to questions," replied "I don't know" and "gave her misleading information." Dr. Kelly also testified that when he asked Goins whether he needed treatment of any kind, Goins stated, "I got a bad temper, I be fighting a lot at school, I snap on somebody." Dr. Kelly was aware from reviewing Goins' school records that Goins had been expelled from high school in the eleventh grade for fighting.

¶ 24      In response, the State presented testimony from Dr. Nishad Nadkarni, another psychiatrist from Forensic Clinical Services. Dr. Nadkarni interviewed Goins on December 19, 2008 and reviewed a report prepared by Dr. Messina, police reports, and Goins' statement. Dr. Nadkarni went through each *Miranda* right with Goins, asked him what it meant, and wrote down Goins' response. When questioned about the right to remain silent, Goins stated, "Thinking I could tell or not tell them." Dr. Nadkarni opined that Goins understood the right to remain silent. Next, Dr. Nadkarni asked Goins about the meaning of the warning that "anything you say may be used against you in court or other proceedings." Goins responded, "They would turn it in" and after Dr. Nadkarni asked Goins, "[W]ho they would turn it in to," Goins replied, "The judge to find you guilty." Dr. Nadkarni asked Goins about the third *Miranda* right to speak to a lawyer before and during police questioning. Goins responded that a lawyer in an interrogation situation would tell you "be quiet." Dr. Nadkarni asked Goins about the fourth *Miranda* right, pertaining to the right to have a lawyer appointed to you if you could not afford a lawyer, and Goins stated that he understood that to mean that a "PD" would be appointed.

¶ 25      Dr. Nadkarni opined within a reasonable degree of medical and psychiatric certainty that Goins would have been capable of understanding his *Miranda* rights at the time of his statement. Dr. Nadkarni testified that he diagnosed Goins with a rule-out diagnosis of cannabis abuse given his history of marijuana usage and provisionally diagnosed Goins with

"borderline intellectual functioning." Dr. Nadkarni testified that he was aware that Goins had been interviewed by other doctors and that at least one doctor had diagnosed Goins with mild mental retardation. Dr. Nadkarni opined that "a condition of mental retardation does not preclude one from understanding *Miranda* warnings."

¶ 26   Detective Matual testified that he interviewed Goins in an interview room at the police station on January 13, 2008, and Goins was not handcuffed. Detective Matual informed Goins that he was under arrest and read Goins his *Miranda* rights one by one. After each *Miranda* right, Detective Matual waited for Goins to respond that he understood the right before going on to the next one. Goins gave the same account of the incident that he told Detective Matual earlier at the hospital. Detective Matual explained to Goins that his account was not consistent with the injuries sustained by Wanya. Goins told the detective that he wanted to tell a State's Attorney what really happened. Detective Matual advised Goins that "somebody will come in to speak to you, she's a lawyer, she's not going to be your lawyer, she's not my lawyer, she's what we call a prosecutor." Detective Matual then left Goins in the interview room and went to find ASA Para.

¶ 27   ASA Para testified that she went to the interview room with Detective Matual. ASA Para introduced herself to Goins and advised Goins of his *Miranda* rights one by one, asking if he understood each right before proceeding to the next one. Goins stated that he understood each *Miranda* right. ASA Para explained to Goins that he could provide an oral statement or she could take a written statement in which she would write down what Goins told her and he would review it to make sure it was accurate. Goins chose the handwritten option.

¶ 28   ASA Para testified that she used a preprinted form for the handwritten statement, which contained a paragraph at the top that advised Goins of his *Miranda* rights. ASA Para testified that she again reviewed the paragraph that explained his *Miranda* rights. After Goins indicated that he understood each right, ASA Para asked him to write his name underneath the paragraph on the line provided. After ASA Para wrote down Goins' statement, she asked Goins to read the entire first page of the statement to her, which he did. ASA Para then read each page of the statement to Goins, stopping at the bottom of each page to ask Goins if he had any changes to the statement and then having Goins sign the bottom of each page. ASA Para and Detective Matual also signed the bottom of each page. ASA Para made four changes to the statement and defendant wrote his initials where each change was made, indicating that he agreed with the change.

¶ 29   The defense called Goins in rebuttal. Goins testified that he did not read the first page of his statement to ASA Para. Goins testified that he could not have read his statement, because he can not read cursive. Goins was asked to read the typewritten *Miranda* rights in court while on the witness stand. Goins read the *Miranda* rights, stumbling on certain words.

¶ 30   After the hearing, the trial court denied Goins' motion to suppress his statement. The trial court noted that "the IQ number hangs heavily over this issue, but that's not [conclusive]." The trial court found that under "the totality of the circumstances," Goins had the capacity to understand his *Miranda* rights at the time of his statement.

¶ 31                               Evidence at Trial

¶ 32      Goins' jury trial began on September 14, 2011. Detective Matual and ASA Para provided testimony for the State, which was substantially similar to the testimony they each gave during the hearing on Goins' motion to suppress his statement. Veronica Goins, Goins' mother, testified Goins had a stutter his whole life and a lifelong history of learning disabilities, which did not prevent him from "being a good dad," and taking care of Wanya. Goins was living in Springfield with Wanya and attending a GED program. Wanya could sit up and walk, but was not able to talk yet.

¶ 33      Goins mother testified that when she returned home on the morning of January 1, 2008, Wanya's eyes were rolled in the back of his head, and he was moaning and unresponsive. She called 911 and an ambulance took Wanya to the hospital.

¶ 34      The State also presented testimony from two medical experts. Dr. Sarah Hoehn testified that she was the pediatric critical care attending physician at the time Wanya was admitted to the hospital. When Wanya arrived, he had bruising on his forehead, swelling and evidence of bleeding in the brain, and been left comatose. As a result, doctors monitored pressure on his brain and made an incision in his brain to allow blood and fluid to drain.

¶ 35      Dr. Kelley Staley, an expert in the field of pediatric medicine and child abuse and neglect testified that she was one of Wanya's treating physicians at the hospital. Dr. Staley testified that Wanya had extensive injuries, including a significant and severe brain injury, a black left eye, bruising on his face in the left forehead area, and blood inside his ear canal. Wanya was intubated, and had a bolt placed in his skull where the neurosurgeon had drilled a hole to allow excess fluid and blood accumulating on his brain to drain. A cervical collar was used to stabilize Wanya's neck. And, IV tubes, containing six different medications, kept him alive, decreased the pressure on his brain, and treated the seizures. The presence of bleeding in two areas of Wanya's brain and swelling throughout the brain suggested "a more forceful mechanism for his injury than what was stated as a simple fall off a bed." Dr. Staley also noted that Wanya "had a scar on his elbow that may have been an old cigarette burn." Defense counsel objected and during a short sidebar noted that the trial court had granted a motion *in limine* barring introduction of Wanya's old injury. The trial court denied defense counsel's motion for a mistrial and instructed the jury to disregard Dr. Staley's statement.

¶ 36      Dr. Staley then testified that Wanya was diagnosed with a schisis cavity, which refers to a type of bleeding in the retina and "is formed after the head undergoes significant forceful trauma." Schisis cavities are caused by "really significant forces acting on the kid's head," and "not just a small fall, a short fall or a bonk on the head that happens in the course of everyday activity." Dr. Staley opined that Wanya's injuries were "inflicted by some sort of blunt trauma that probably involved shaking or repetitive action, because this schisis cavity *** has been very specifically associated with shaking-type of injury."

¶ 37      Dr. Staley said she was familiar with the idea that children who have hydrocephalus, a congenital condition, can be more susceptible to a subdural hematoma for a short fall. Based on the test results that were performed in the hospital, Dr. Staley did not believe that Wanya had hydrocephalus before his injury. Dr. Staley explained that, based on her own clinical experience and the published medical literature, children that have hydrocephalus and suffer

a short fall usually have a single area of bleeding on their brain rather than the multiple bruises and areas of bleeding in the back of the eye sustained by Wanya.

¶ 38    Regarding the long-term effects of Wanya's injuries, Dr. Staley testified that after treating Wanya in the hospital for over a month, "it became clear that he was severely impacted in his function." Dr. Staley described Wanya's brain injury as "devastating," leaving him blinded and unable to feed himself. Also, as a result of his injuries, Wanya suffered from a seizure disorder and needed ongoing treatment and medication. Dr. Staley testified that she was aware that there was a delay in taking Wanya for immediate treatment following his injury and that when a child had a brain injury like Wanya's, the best thing is to get treatment as soon as possible.

¶ 39    Dr. Staley also testified that Wanya "would not have been recognizable in the sense that before his father told me he walked, had words, could use a spoon and a fork, and when I last saw him he was laying in a hospital bed with not really any meaningful interaction with his environment." The trial court overruled defense counsel's objection to the evidence, finding it relevant to prove the element of great bodily harm.

¶ 40    The defense presented testimony from Dr. Joseph Scheller, a pediatric neurologist and child abuse expert, who reviewed Wanya's medical records. Dr. Scheller testified that Wanya suffered from hydrocephalus, which causes excess fluid in the brain, and explains why Wanya may have suffered severe injuries from a simple fall off of a bed. During cross-examination, Dr. Scheller testified that the type of injuries that Wanya suffered do not typically occur in children who suffer from external hydrocephalus and fall off of a bed.

¶ 41    Dr. Eric Neu, the psychologist who evaluated Goins after Dr. Echevarria referred Goins for cognitive testing, also testified for the defense. Dr. Neu testified that he conducted IQ testing and Goins obtained a full scale IQ score of 61, placing him in the low range of intellectual functioning and, as below 70, in the range of someone with mild mental retardation. Goins sought to introduce more information from Dr. Neu's evaluation, including that he tested Goins and found no signs of malingering and that Goins' responses to certain questions indicated that he had mild mental retardation. The State objected, arguing that it did not require an expert to understand defense counsel's argument that Goins was more suggestible and more likely to provide a statement to police and the ASA based on Goins' low level of mental functioning. The trial court granted the State's motion to exclude this portion of Dr. Neu's testimony.

¶ 42    The defense called Tyrone Woods, Goins' father, who testified that on December 31, 2007, he did not call Goins to inform him that his younger brother had passed away. Woods testified that Goins' little brother was still alive.

¶ 43    After closing arguments, the jury found Goins not guilty of attempted first degree murder, and guilty of aggravated battery of a child. Goins filed a motion for a new trial, which the trial court denied. Goins was sentenced to 11 years in prison, and his motion to reconsider sentence was denied. Goins timely appealed.

¶ 44                                    ANALYSIS

¶ 45                                  *Miranda* Waiver

¶ 46      Goins does not contend that his statement resulted from any type of intimidation, coercion, or deception; rather, the sole question is whether the statement was made after Goins knowingly and intelligently waived his *Miranda* rights.

¶ 47      In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under this standard, the ultimate question of whether defendant's statement was voluntary is reviewed *de novo*. *Luedemann*, 222 Ill. 2d at 542. On the other hand, the question of whether a defendant knowingly and intelligently waived the *Miranda* rights is factual in nature and reviewed under a manifest-weight-of-the-evidence standard. *Id.* This is true because the trial court is in the superior "position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 48      A person accused of a criminal offense is constitutionally entitled to the assistance of counsel and to remain silent during in-custody interrogation. *Miranda*, 384 U.S. at 478-79. Any statements obtained in derogation of those rights are inadmissible in a later criminal prosecution unless those rights were voluntarily, knowingly, and intelligently waived. *Id.* at 479; *People v. Bernasco*, 138 Ill. 2d 349 (1990). A defendant validly waives *Miranda* when he or she (1) freely and deliberately (voluntarily) relinquishes the right and (2) is fully aware of both the nature of the right being abandoned and the consequences of the decision to do so. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009). At a hearing on a motion to suppress, the State has the burden of demonstrating, by a preponderance of the evidence, the *Miranda* waiver was the product of (1) an uncoerced choice and (2) the requisite level of comprehension. *Id.*; *People v. Reid*, 136 Ill. 2d 27, 54 (1990). Once the State has established its *prima facie* case, the burden shifts to defendant to show that waiver was not knowing, intelligent or voluntary. *Reid*, 136 Ill. 2d at 54.

¶ 49      Goins argues that his statement should have been suppressed by the trial court where the evidence established that, due to his limited mental capacity, he was unable to knowingly and intelligently waive his *Miranda* rights. In determining whether a waiver is knowing and intelligent, the court must look at the specific facts and circumstances, including the defendant's background, experience, and conduct. *People v. Braggs*, 209 Ill. 2d 492, 515 (2003). A defendant's limited intellectual capacity must be taken into consideration in determining whether a waiver is valid. *In re W.C.*, 167 Ill. 2d 307, 328 (1995). This is because "it is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514.

¶ 50    Nevertheless, a defendant's mental deficiency, by itself, does not render a statement inadmissible. Rather, it is one factor that must be considered along with the totality of circumstances under which *Miranda* rights were waived. *In re W.C.*, 167 Ill. 2d at 328. A defendant need not have "the ability to understand far-reaching legal and strategic effects of waiving one's rights" but must have "the ability to understand the very words used in the warnings." *Bernasco*, 138 Ill. 2d at 363.

¶ 51    Goins relies on the testimony of Drs. Echevarria and Kelly in asserting that his *Miranda* waiver was invalid. Dr. Echevarria, in turn, relied on the report from Dr. Neu, who found that Goins had an IQ of 61 and diagnosed him with mild mental retardation. Dr. Echevarria explained that Goins had the ability to read, but had a delay and difficulty understanding certain words. Dr. Echevarria ultimately concluded that Goins did not have the ability to understand his *Miranda* rights at the time of his statement. Dr. Kelly also relied on Dr. Neu's diagnosis to conclude that Goins would not have been able to understand his *Miranda* rights at the time of his statement.

¶ 52    In contrast, the State points to evidence supporting its position that defendant's *Miranda* waiver was made both intelligently and knowingly. The State highlights the testimony from Detective Matual and ASA Para that Goins was advised of his *Miranda* rights multiple times. Each time Goins was advised of his *Miranda* rights, either Detective Matual or ASA Para would pause between each right and Goins acknowledged that he understood each of his rights. Goins signed the statement form indicating that he understood his rights, and signed the bottom of each page of his statement and initialed changes ASA Para made to the statement.

¶ 53    With respect to the expert testimony, the State notes that the first doctor to examine Goins, Dr. Messina, found Goins to be uncooperative and able to give misleading responses. The State relies on its expert, Dr. Nadkarni, who testified that Goins understood his *Miranda* rights and would have been able to knowingly and intelligently waive them at the time of his statement, based on the answers he provided during his interview with Dr. Nadkarni. While Goins asserts that Dr. Nadkarni's evaluation was seriously flawed where it failed to include consideration of Goins' mental abilities, the record shows that Dr. Nadkarni did consider Goins' mental limitations during his evaluation. Dr. Nadkarni testified that he diagnosed Goins with a rule-out diagnosis of cannabis abuse given his history of marijuana usage and provisionally diagnosed Goins with "borderline intellectual functioning." Dr. Nadkarni also testified that he was aware that at least one doctor had diagnosed Goins with mild mental retardation. While Dr. Nadkarni considered Goins' mental deficiencies, he also opined that "a condition of mental retardation does not preclude one from understanding *Miranda* warnings."

¶ 54    The State points out that although Drs. Echevarria and Kelly relied on Dr. Neu's report to find that Goins would have been unable to understand his *Miranda* rights at the time of his statement, they both testified that, during their interviews, Goins' responses indicated his ability to understand his rights.

¶ 55    Finally, the State notes that at the time of the incident, Goins was 20 years old and had attended high school until the eleventh grade. Goins was living on his own and caring for his

-11-

young son, while attending GED classes. Goins' mother testified that Goins' learning disabilities did not preclude him from living independently and caring for his young son.

¶ 56 The trial court agreed with the State, finding defendant's *Miranda* waiver valid. The trial court noted that "the IQ number hangs heavily over this issue, but that's not [conclusive] with any findings in this case" and recognized that "61 is a difficult number to deal with" in terms of IQ. The trial court then concluded, "I find that [Goins] had the capacity to understand his *Miranda* rights taken under the totality of the circumstances [in this] case."

¶ 57 The trial court properly considered all of the evidence presented, which included evidence that Goins was advised of his *Miranda* rights on multiple occasions and conflicting expert testimony regarding Goins' ability to understand those rights. As already mentioned, we give deference to the trial court as the finder of fact and will not substitute our judgment for that of the trial court regarding the weight to be given the evidence or the inferences to be drawn therefrom. *Deleon*, 227 Ill. 2d at 332. Our supreme court has recognized, "[T]he credibility and weight to be given psychiatric testimony are matters for the trier of fact, who is not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State." *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007). In light of the entire record, we cannot say that the trial court's finding that Goins' *Miranda* rights were validly waived was "unreasonable, arbitrary, or not based on the evidence presented." *Deleon*, 227 Ill. 2d at 332.

¶ 58 We next address Goins' argument that the trial court improperly based its decision on Goins' ability to participate in the hearing, rather than at the time of the statement, and the court's belief that Goins was attempting to "protect himself" at the time he made the statement.

¶ 59 In entering its ruling, the trial court stated:

"As to whether or not the defendant understood his *Miranda* [rights] *on the date in question*, the issue becomes whether or not the defendant is aware that he has choices on the day in question. The choices are the right to remain silent, the right to an attorney, the right to have an attorney provided if he can't afford one, and the knowledge that if he does say something, it can be used against him in court.

As concerns the right to remain silent and there's several choices. The choice is to remain silent or attempt to talk his way out of it.

The *totality of circumstances here, the IQ number hangs heavily over this issue*, but that's not conclusory with any findings in this case. It's the defendant's ability to understand, that he can attempt to protect himself when he is confined in that ten-by-ten room in the Chicago Police Department over a period of three hours by himself according to the detective who comes in the second time." (Emphases added.)

¶ 60 As we previously explained, in determining whether a waiver is knowing and intelligent, the trial court must look at the specific facts and circumstances, including the defendant's background, experience, and conduct. *Braggs*, 209 Ill. 2d at 515. The court is also to consider a defendant's limited intellectual capacity in making its determination. *In re W.C.*, 167 Ill. 2d at 328. Here, the trial court specifically noted that "the IQ number hangs heavily over this issue" and "61 is a difficult number to deal with," indicating that the court gave proper

-12-

consideration to Goins' limited mental capacity at the time of his statement. While the trial court mentioned that it "had no difficulty with the defendant, *** the [S]tate's [A]ttorney, [or] *** the doctors" and its "observations of Mr. Goins during the pendency of this matter," such factors were part of the court's analysis of defendant's background, experience, and conduct. The trial court also explained that in considering the validity of Goins' waiver, the court was to determine "whether or not the defendant understood his *Miranda* [rights] *on the date in question*." (Emphasis added.) The trial court further stated "[T]he issue becomes whether or not the defendant is aware that he has choices *on the day in question*" (Emphasis added.) Given the totality of circumstances, we cannot say that the trial court's finding was against the manifest weight of the evidence. *Deleon*, 227 Ill. 2d at 332.

¶ 61    Goins further argues that the trial court erroneously based its decision on its perception that Goins was trying to "protect himself" and "talk his way out of this." In making its ruling, the trial court stated "It is clear to people that Mr. Goins knows that he needs to protect himself. He did it in his testimony on the chair here as he testified in this court in this case." The trial court also commented that at the police station, 13 days after his interview at the hospital, "He chose to protect himself by attempting to talk his way out of this." We find that these remarks were part of the trial court's assessment of Goins' credibility and demeanor, and the trial court was in the better position to make a credibility determination. *Pitman*, 211 Ill. 2d at 512. The trial court properly considered the totality of circumstances in determining that Goins' waiver was knowing and intelligent. We cannot find that the trial court's finding was against the manifest weight of the evidence.

¶ 62                    Trial Court's Limits on Dr. Neu's Testimony

¶ 63    We next consider Goins' argument that the trial court erred when it granted the State's motion *in limine* and limited Dr. Neu's testimony to his assessment of Goins' IQ and diagnosis of mild mental retardation. Goins contends that Dr. Neu should have been permitted to testify that he found no evidence that Goins was malingering or faking a cognitive impairment. Goins also argues that Dr. Neu should have been able to testify about his conversation with Goins because it provided the basis for Dr. Neu's diagnosis of mental retardation. Goins asserts that this evidence was critical to his defense because the jury was charged with the task of weighing the veracity of his statement.

¶ 64    "Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). An abuse of discretion will be found only where the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 65    Whether to admit expert testimony is a matter within a trial court's discretion. *People v. Howard*, 305 Ill. App. 3d 300, 307 (1999). A trial court should not permit expert testimony if it would not help the fact finder understand an aspect of the evidence it otherwise would not understand or if it would invade the province of the fact finder to determine witness credibility and assess the facts of the case. *Howard*, 305 Ill. App. 3d at 307-08.

-13-

¶ 66    The trial court did not abuse its discretion in refusing to allow Dr. Neu to testify about the lack of evidence that Goins was malingering or trying to deceive him during the evaluation. Such testimony would have impinged on the province of the jury to determine Goins' credibility and assess the facts of the case. See *Howard*, 305 Ill. App. 3d at 308 (finding that testimony of psychologist, who diagnosed witness with battered woman syndrome, that there was no evidence that witness tried to deceive her infringed on jury's role to determine credibility and assess facts of case).

¶ 67    Goins also argues that the trial court should have permitted Dr. Neu to testify about Goins' responses to questions during his evaluation because the responses provided the basis for the diagnosis of mild mental retardation. The specific proffered evidence was:

> "That [Goins] displayed minimal interest sub-test scattered, meaning that [Goins] tended to answer the most basic questions correctly and struggled with moderately difficult items. This pattern is typical for someone suffering from mental retardation.
>
> That during the tests [Dr. Neu] did ask questions. For example, when asked to define the word 'repair,' [Goins] replied like I have a pair of socks. When asked in what direction does the sun rise, [Goins] stated, all over. When asked why many foods need to be cooked, [Goins] responded, might want to eat something different and for [*sic*] the food won't get old."

¶ 68    With respect to this evidence, the trial court held that Dr. Neu "cannot testify as to his conversations with the defendant during the course of that exam, but he can testify [as to] the balance of the information, the reasonable fact-finder does not need the aid of a professional to arrive at those decisions." The record shows that Dr. Neu testified that he conducted IQ testing on Goins and that Goins obtained a full-scale IQ score of 61, placing him in the extremely low range of intellectual functioning. Dr. Neu also testified that the IQ score of 70 or below was one of the conditions for a diagnosis of mental retardation.

¶ 69    The trial court found that the jury, as fact finder, could assess the credibility of the expert witness' testimony. That is, the jury did not need to hear the specific responses provided by Goins during his interview with Dr. Neu to understand that an individual with an IQ score of 61 and diagnosis of mild mental retardation might struggle to define certain words. But, Goins cites our supreme court's holding in *People v. Anderson*, 113 Ill. 2d 1 (1986), to argue that Dr. Neu should have been allowed to testify about the responses where they contributed to Dr. Neu's diagnosis of mild mental retardation.

¶ 70    In *Anderson*, the supreme court held an expert should be allowed to reveal, on direct examination, the contents of materials on which he or she reasonably relied in forming an opinion. *Anderson*, 113 Ill. 2d at 9. The expert may rely on reports compiled by others if the materials are of a kind customarily relied on by members of the profession. This procedure allows the jury to evaluate the expert testimony. *Anderson*, 113 Ill. 2d at 10-11. The court also held that a psychiatric expert may testify regarding statements made to him or her by a defendant which figure into the professional diagnosis concerning the issue of sanity, regardless of whether the psychiatrist is a treating or non-treating physician. *Anderson*, 113 Ill. 2d at 12-13. In *Anderson*, the expert relied on reports by other psychiatrists, doctors and counselors. The expert also relied on statements made by the defendant to him and letters

written by or at the direction of the defendant in forming his opinion as to defendant's sanity. *Anderson*, 113 Ill. 2d at 7.

¶ 71    In this case, Dr. Neu testified that after his interview and testing, Goins obtained an IQ score of 61 and Dr. Neu diagnosed him as mildly mentally retarded. Goins maintains that under the supreme court's analysis in *Anderson*, Dr. Neu should have been allowed to testify about the questions he asked Goins during his interview. But, we find *Anderson* factually distinguishable, where the expert in that case evaluated the defendant's sanity and the testimony concerned statements and letters from the defendant that the expert used to form his opinion. In this case, the proffered testimony involved Goins' responses to interview questions that were indicative of an individual with mental retardation.

¶ 72    Even if the trial court improperly limited Dr. Neu's testimony, it would be harmless. When inquiring into whether an error is harmless beyond a reasonable doubt, the court should ask whether the harm complained of contributed to defendant's conviction. *Chapman v. California*, 386 U.S. 18, 23-24 (1967). Goins argues that preventing Dr. Neu from testifying fully about the process of his examination deprived the jury of a full understanding of Neu's opinion, including the fact that there was no evidence of malingering. The record shows that Dr. Neu testified regarding Goins' IQ results, low level of mental functioning, and his diagnosis of mild mental retardation. The proffered testimony involved three questions and answers between Dr. Neu and Goins, which where indicative of Goins' mental limitations. But, the admission of Goins' responses would not have been determinative of the fact that Goins was not malingering. The testimony relating to Goins' low level IQ and diagnosis of mild mental retardation sufficiently raised doubt that Goins would not have been capable of malingering. It was within the province of the jury, as fact finder, to assess the credibility of the witnesses and the jury could consider defense counsel's argument that Goins was more suggestible and more likely to provide a statement based on his low level of mental functioning. We cannot say that the trial court's limiting of these three interview questions and answers contributed to Goins' conviction. Hence, any error in limiting Dr. Neu's testimony was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24. Since we find any error in limiting Dr. Neu's testimony harmless, we need not consider Goins' alternative argument that the trial court erred in not allowing the testimony after the State "opened the door" to such testimony during its cross-examination of Dr. Neu.

¶ 73              Testimony Regarding the Victim's Prior and Permanent Injuries

¶ 74    We next review Goins' argument that he was denied a fair trial when Dr. Staley testified regarding a scar on Wanya's elbow and the extent of Wanya's injuries. Goins contends that Dr. Staley's testimony was not relevant to any issue at trial but, rather, designed to inflame the passions of the jury.

¶ 75    During trial, the State asked Dr. Staley:

"Now, Doctor, after you examined Wanya and observed his injuries, can you describe what exactly his injuries were for the Ladies and Gentlemen of the jury?"

Dr. Staley testified:

"Well, when I examined him he was in a coma. It was what we call a phenobarbital

-15-

coma. That's a very, very powerful anti-seizure medicine.

This child was very sick. He was on numerous medications. That meant that my physical exam in terms of what he could do neurologically was not possible because he was in a coma.

So I had to do a couple things. Look in his ears and at his skin for bruises, and that's why I found the, the three bruises, two on his head and the blood in his ear canal.

He had a scar on his elbow that may have been an old cigarette burn."

¶ 76 Defense counsel objected and during a short sidebar noted that the trial court had granted a motion *in limine* barring introduction of Wanya's scar. The State explained that it instructed Dr. Staley not to mention the scar and that it would move on to something else. The trial court instructed the jury to disregard Dr. Staley's statement and the State moved on to question Dr. Staley regarding a CAT scan ordered in Wanya's case. We find that the prompt action by the trial court in sustaining the objection cured any prejudicial impact by the brief testimony. *People v. Sutton*, 353 Ill. App. 3d 487, 500 (2004); *People v. Kidd*, 175 Ill. 2d 1, 51 (1996). In addition, the State did not revisit the testimony.

¶ 77 Goins next asserts that the detailed testimony by Dr. Staley describing Wanya's long-term injuries while hospitalized was inflammatory, suggesting child abuse, and deprived him of a fair trial. Goins states that even if the testimony was relevant, the State already established great bodily harm, as an essential element of aggravated battery to a child, when it produced the testimony of Dr. Staley and the testimony of Dr. Hoehn, which both described Wanya's injuries when he arrived at the hospital.

¶ 78 The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged. *People v. Ward*, 101 Ill. 2d 443, 455 (1984). Whether what is offered as evidence will be admitted or excluded depends on whether it tends to make the question of guilt more or less probable, *i.e.*, whether it is relevant. *Id.* The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Id.* at 456.

¶ 79 Evidence that could be considered inflammatory will not be withheld if relevant and necessary to an issue. *People v. Villa*, 93 Ill. App. 3d 196, 201 (1981) (detailed testimony by two doctors describing brain surgeries performed on police officer, who was allegedly shot by defendant, was properly submitted to jury to establish essential elements in aggravated battery charge). The nature and the seriousness of the injury is an essential element of aggravated battery and the proof thereof is proper. *People v. Nard*, 32 Ill. App. 3d 634 (1975).

¶ 80 Dr. Staley's testimony described Wanya's serious injuries and their consequences, which was an essential element in the aggravated battery of a child charge. 720 ILCS 5/12-4.3(a) (West 2008). It is fundamental that a defendant is responsible for the results of his or her acts and a jury should be allowed to hear the nature and extent of the great bodily harm inflicted. *Villa*, 93 Ill. App. 3d at 201. We, therefore, find that it was not improper for the trial court to allow Dr. Staley's testimony.

¶ 81 Goins, nonetheless, asserts that even if Dr. Staley's testimony was relevant, it was unnecessary and prejudicial where other evidence established the element of great bodily

harm. Dr. Neu and Dr. Staley both testified regarding Wanya's injuries when he first arrived at the hospital. Dr. Staley's subsequent testimony, however, related to her treatment of Wanya over the course of a month and her observations of Wanya's extensive injuries and the consequences of those injuries. We cannot say that such testimony was unnecessary to establish great bodily harm.

¶ 82                           Closing Arguments

¶ 83    Next, Goins contends that the prosecutor made improper remarks during closing arguments by (1) repeatedly referring to the victim's permanent disabilities; (2) asking the jury to obtain justice for the victim; (3) referring to evidence of defendant's cognitive delays as "a pile of baloney," and a "story," and telling the jury "don't buy it"; (4) stating that the jury should not believe Goins' father's testimony; and (5) referring to a gorilla in the zoo.

¶ 84    Generally, the prosecution has wide latitude in making its closing argument. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2006); *People v. Blue*, 189 Ill. 2d 99, 127 (2000). During closing arguments, the prosecutor may comment on the evidence and any "fair, reasonable inferences" from it, even if those inferences reflect negatively on the defendant. *Nicholas*, 218 Ill. 2d at 121. In doing so, however, the prosecution must make sure the closing argument serves a purpose other than merely "inflaming the emotions of the jury." *Nicholas*, 218 Ill. 2d at 121; *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

¶ 85    We will not interfere with the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A "prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998). In reviewing allegations of prosecutorial misconduct during closing argument, the remarks must be considered in light of the entire arguments of both the prosecution and the defense. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). And, a prosecutor may respond to comments made by defense counsel which invite a response. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).

¶ 86    Goins argues that the State repeatedly urged the jury to consider the case in light of Wanya's permanent disabilities. The State argued:

"[I]n 2007 [Goins] believed he was a father and in November of 2007 he took his son Wanya *** to go live with him in Springfield. Now by all accounts this seemed like it was going to be a good thing, Wanya was going to get a dad, but on December 31st of 2007 that good thing, that dad, that protector and that defender turned out to be his abuser because at the hands of this defendant Wanya's life changed forever, never again to see–

                              * * *

    No mobility, severely impaired no function."

¶ 87    Defense counsel objected and the trial court sustained that objection. Later during closing arguments, the State remarked:

"And then great bodily harm. I just told you what he did, his act, how when Wanya Lawson got to that hospital which cannot and has not been disputed that child had a black eye, that child had bleeding behind his eyes, that child had blood in his ear and that child was bleeding on several multiple areas of his little brain. That, Ladies and Gentlemen, is great bodily harm because then the doctor told you what those injuries were from, what happened, how is he now. She told you about how she saw him and what Baby Wanya could even do. He wasn't moving his legs, severely impaired, no mobility, no function, that he walked funny. He won't walk funny again. When he was able to feed himself what did the doctor tell you? He cannot feed himself because he cannot eat."

¶ 88    Defense counsel objected and the trial court sustained that objection.

¶ 89    The prosecutor's argument, read in its entirety, shows that the comments related to establishing great bodily harm, which is an essential element of aggravated battery of a child. 720 ILCS 5/12-4.3(a) (West 2008). We find that the prompt action by the trial court in sustaining Goins' objections cured the prejudicial impact of any improper comments made while arguing that the State established this element of the offense. *Sutton*, 353 Ill. App. 3d at 500; *Kidd*, 175 Ill. 2d at 51. The jury was also instructed that "neither opening nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Jurors are presumed to follow the trial court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 90    Goins relies on *People v. Williams*, 333 Ill. App. 3d 204 (2002), to argue that sustaining the objections and appropriate jury instructions were not sufficient to cure any prejudice. In *Williams*, this court explained, " 'Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by introduction of such evidence. Whether the remarks and/or evidence constitute error depends, in each case, on the nature and extent of the statements and whether they are probative of defendant's guilt.' " *Williams*, 333 Ill. App. 3d at 214 (quoting *People v. Blue*, 189 Ill. 2d 99, 132 (2000)). In that case, the State used unsupported cross-examination questioning to argue to the jury that the defendant shot the victim because he knew he was going to be declared the father of the victim's child at an upcoming court hearing and wanted to avoid child support. *Williams*, 333 Ill. App. 3d at 214. This court found reversible error where the State's comments were not based on the evidence and the State persisted in its argument before the jury. This court explained, "We cannot presume that the State's improper argument, imputing to defendant a motive, did not affect the jury's verdict." *Williams*, 333 Ill. App. 3d at 214.

¶ 91    Unlike *Williams*, here the State's argument was based on the evidence that Wanya had suffered extensive injuries. At trial, Dr. Stanley testified regarding Wanya's "devastating brain injury" and the result of those injuries, including the fact that Wanya could not walk, speak, or feed himself. The State did not improperly ascribe a motive to Goins or rely on arguments not based on the evidence. We find that the jury instruction, together with the trial court's action in promptly sustaining Goins' objection, precluded substantial prejudice in this case.

¶ 92    Goins next contends that the State improperly argued during closing and rebuttal arguments that the jury should "obtain justice for the victim." During closing argument, the

State remarked that "it is time to speak up for Wanya." During rebuttal argument, the State commented:

> "Today is the day for Wanya Lawson to receive justice, Ladies and Gentlemen.
>
> * * *
>
> Today is also the day for this defendant to receive justice, and the way that the defendant and Wanya Lawson can receive justice for what he did to Wanya is to find him guilty, guilty of aggravated battery to a child and guilty of attempt murder and nothing, nothing less."

¶ 93 During closing arguments, the State may denounce the activities of the defendant and urge that justice be administered. *People v. Brooks*, 246 Ill. App. 3d 777, 788 (1993). Therefore, this argument was not improper.

¶ 94 Goins also asserts that the prosecutor made repeated disparaging references to his cognitive limitations, by calling the evidence "a pile of baloney, "a story," and telling the jury "don't buy it." During closing arguments, the prosecutor stated:

> "So if you don't believe that, didn't believe that there is a learning disability and the IQ in the 60's means that I'm just not smart enough to know how to call for help, I'm just not smart enough to call 911, I'm just not smart enough to know how to lie, I'm just not smart enough to know and talk about what really happened, what a pile of baloney."

¶ 95 Throughout trial, the defense maintained that due to Goins' limited cognitive abilities, he was unable to waive his *Miranda* rights, provide the statement, and seek help for Wanya after his injuries. We find the prosecutor's argument was not improper where these remarks were in response to Goins' theory of defense and based on the evidence and reasonable inferences drawn therefrom. *Hudson*, 157 Ill. 2d at 441. Further, the prosecutor was permitted to comment on the illogical nature of defense counsel's argument. See *People v. Franklin*, 135 Ill. 2d 78, 112 (1990) (no substantial prejudicial in State's characterization of defendant's closing arguments as "shocking," "insulting," "bunk," and "abominable").

¶ 96 Goins also complains that the prosecutor improperly suggested that Goins was a liar where the State argued that Goins had "[thrown] that story up here that this defendant has a low IQ and didn't give this statement." A defendant can be called a "liar" in argument, provided evidence of lying exists or reasonable inferences of lying can be drawn from the evidence. *People v. Strange*, 125 Ill. App. 3d 43, 46 (1984). Goins' defense included asserting that he could not have provided the statement transcribed by ASA Para, where he could not have read or understood that statement. This was inconsistent with the testimony of ASA Para and Detective Matual. Therefore, there was a basis in the record for the State to point out inconsistencies. The State also refrained from calling Goins a "liar." The State's argument was not improper in this respect.

¶ 97 Goins further contends that he was prejudiced where the State argued during rebuttal that his father, Tyrone Woods, "had to be" lying during his testimony. The complained of argument is as follows:

> "And Ladies and Gentlemen, the story about the defendant's father, well, you can't believe that the defendant made this statement because his father got up here and he said,

well, I never called him, I never said those things that didn't happen. Again, Ladies and Gentlemen, consider a person's interest and bias when they testify. They have to come in here and they have to say that."

¶ 98 In Goins' statement to ASA Para, he stated that on the night of Wanya's injury, Goins' father, Woods, called Goins to tell him that his two-year-old brother had died. Goins stated that he was "angry, upset, sad, crying, and frustrated," and "there was no one home for him to talk to about how he felt." Goins stated that he then hit Wanya. At trial, Woods testified that he did not call Goins that night, and that Goins' brother was still alive. During closing arguments, defense counsel argued that Woods' testimony called Goins' entire statement into question. Defense counsel argued that since Goins' brother was still alive, there was no motive for Goins to be upset and hit Wanya. The State's remarks during rebuttal were a legitimate response to defense counsel's argument. See *People v. Evans*, 209 Ill. 2d 194, 225 (2004) (prosecution may fairly comment on defense counsel's characterizations of evidence and may respond in rebuttal to statements of defense counsel that noticeably invite response). Also, the prosecutor's comments were a permissible comment on the witness' bias and interest in the result of this case. *People v. Barney*, 176 Ill. 2d 69 (1997) (holding that prosecutor may comment on witness', including a defendant's, bias and interest in result of case when weighing witness' testimony).

¶ 99 Lastly, Goins argues that the State improperly suggested that a gorilla would be a better parent than Goins had been to Wanya. During closing arguments, the prosecutor referred to an incident that occurred at Brookfield Zoo, where a gorilla picked up a small child, who had fallen into the gorilla exhibit, and took the child to the zookeeper's door in an effort to help the child. The prosecutor argued:

"You heard all the facts of this case, you heard all the evidence of this case. This has nothing to do with the level of intelligence, it has nothing to do with an IQ. You remember the story of the child who fell into the gorilla cage. The gorilla picked up the child, cradled the child in its arm, Brookfield Zoo and took the child.

\* \* \*

Took the child to the zoo keeper's door where it could be rescued. A gorilla knew what to do. This is not IQ, this is not intelligence here. The defendant did not want to save Wanya's life on that day, he didn't. This has nothing to do with reckless conduct. This isn't reckless conduct, this was an intentional act."

¶ 100 Goins, relying on *People v. Johnson*, 119 Ill. 2d 119, 139 (1987), argues that is was improper to compare him to an animal. In *Johnson*, the court held that is was improper to characterize the defendant as an "animal," but where the prosecutor's comment was isolated and not dwelled upon, it did not amount to reversible error. *Johnson*, 119 Ill. 2d at 140. In this case, the prosecutor did not characterize Goins as an "animal." While not particularly artful, the prosecutor was responding to Goins' theory of defense that due to Goins' limited mental capacity, he did not seek help for Wanya immediately after his injury. The evidence at trial showed that Goins did not call 911 on the evening of Wanya's injury, and Wanya was not taken to the hospital until the following morning when Goins' mother called 911. Dr. Staley also testified that the delay in taking Wanya to the hospital was significant when a

child has a brain injury. Thus, the prosecutor was responding to Goins' theory of defense by arguing that seeking help for an injured child is instinctual rather than based on intellectual functioning. Also, the prosecutor's remarks related to establishing "intent to kill," an element of attempted first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)). The State argued that Goins did not seek medical treatment for Wanya following his injuries and, therefore, did not intend to save his life. We find the prosecutor's argument was not improper.

¶ 101    After a thorough review of the arguments made by both parties, we find no error in the State's comments. The State's argument, read in its entirety, shows that the comments Goins complains of were based on the evidence presented and the reasonable inferences drawn from the evidence. In addition, the State's argument properly responded to Goins' arguments and his theory of defense.

¶ 102                                    III. CONCLUSION

¶ 103    We affirm the trial court's determination that Goins voluntarily, knowingly, and intelligently waived his *Miranda* rights, where considering the totality of circumstances, including Goins' limited mental capacity, this finding was not against the manifest weight of the evidence.

¶ 104    The trial court properly limited Goins' expert's testimony to his findings that Goins' IQ was 61 and diagnosis of mild mental retardation, where the jury, as trier of fact, was charged with determining the credibility of the witnesses and the weight to be given their testimony.

¶ 105    Goins was not deprived of a fair trial based on testimony by the State's expert witness regarding the victim's long-term injuries and the expert's brief mention of a scar on the victim.

¶ 106    The State's closing arguments were proper. After examining the complained of comments, within the context of both parties' arguments, we find the prosecutor's remarks did not fall outside the bounds of reasonable argument based on the evidence or the reasonable inferences drawn therefrom, or as invited by defense counsel's argument.

¶ 107    Affirmed.