NOTICE
Decision filed 03/06/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 210428-U

NO. 5-21-0428

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 20-CF-120 |
| | ) | |
| TRAVIEL C. GIBSON, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice McHaney and Justice Welch concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm the defendant's conviction where the trial court did not err in denying the defendant's motion to suppress statements, the admittance of character evidence was not an abuse of discretion, and certain remarks within the prosecutor's closing argument did not result in reversible error.

¶ 2     Following a jury trial, the defendant, Traviel C. Gibson, was convicted of first degree murder and robbery. The defendant was subsequently sentenced to consecutive terms of 70 years' imprisonment in the Illinois Department of Corrections (IDOC) for first degree murder with a 3-year term of mandatory supervised release (MSR) and 5 years' imprisonment for robbery with a 1-year term of MSR.

¶ 3     On appeal, the defendant argues that the trial court erred in denying his motion to suppress statements, improperly admitting character evidence, allowing the State to commit prosecutorial

1

misconduct during closing arguments, and that the cumulative effect of these errors was to deny the defendant a fair trial. For the following reasons, we affirm the judgment of the trial court.

¶ 4                                    I. BACKGROUND

¶ 5     On May 13, 2020, Sam Gibson, the defendant's father, was found deceased with multiple gunshot wounds at his house. The investigation showed the defendant was present at Sam's house when Mt. Vernon Police Department (MVPD) officers arrived, and he was subsequently arrested and interviewed. The defendant was taken into custody and made a statement to Detectives Koontz and Osborn at the MVPD. Prior to the custodial interview, the defendant initialed a form containing warnings relating to his constitutional rights outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966), titled "Statement of Constitutional Rights and Waiver" (*Miranda* waiver). The custodial interview was video recorded.

¶ 6     On May 15, 2020, the defendant was charged with three counts of first degree murder, Class M felonies, in connection with Sam's death. Counts I and II were charged in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(1) (West 2020)), as intentional first degree murder, and count III was charged in violation of section 9-1(a)(2) of the Criminal Code (*id.* § 9-1(a)(2)), as first degree murder based on the defendant's knowledge that he was creating a strong probability of death or great bodily harm. Each count alleged that the defendant committed the crime while personally discharging a firearm that proximately caused a death, resulting in a mandatory firearm enhancement of 25-years to a term of natural life to be added to the term of imprisonment imposed by the trial court. See 730 ILCS 5/5-8-1(d)(iii) (West 2020). The defendant was also charged with one count of robbery, a Class 2 felony, in violation of section 18-1(a) of the Criminal Code (720 ILCS 5/18-1(a) (West 2020)),

alleging that the defendant knowingly took the property, a cellular telephone (phone), from Rhonda Wesley, who was Sam's girlfriend, by the use of force.

¶ 7     On July 21, 2021, the defendant filed a motion to suppress statements pursuant to section 114-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-11 (West 2020)), requesting that any statements made by the defendant to law enforcement at the time of and subsequent to his arrest be suppressed. The motion argued that his statements made during his post-arrest custodial interview were involuntary and obtained in violation of the fifth, six, and fourteenth amendments of the United States Constitution, and their counterparts in the Illinois Constitution. U.S. Const., amends. V, VI, XIV; Ill. Const. 1970, art. 1, §§ 2, 10. The defendant further argued that the *Miranda* waiver was not an effective waiver of his rights, as it was not made voluntarily, knowingly, or intelligently.

¶ 8     At the hearing on the motion to suppress statements, the trial court heard testimony from the detectives present during the defendant's interview, viewed the audio-video recording of the interview, and the completed *Miranda* waiver. The detectives testified that the defendant was arrested at Sam's house and transported to the MVPD. Once there, the defendant was taken into a room where the interview was conducted and recorded. Detective Koontz testified that at the time of the custodial interview, the defendant did not appear to be under the influence of any alcohol or substances. At the start of the video, Detective Koontz said, "[B]efore we ask you any questions, since you're in custody, I got to read you your rights. Okay?" Detective Koontz then told the defendant that at the time of questioning, he was in custody for obstructing justice and a battery. The interview proceeded with the following:

"DETECTIVE KOONTZ: But we're going to find out what's going on. Okay. You have the right to remain silent. Okay. Anything you say can be used against you in court

3

or other proceedings. You have the right to talk to a lawyer for advice before we ask you any questions and—and to have him with you—him or her with you during questioning.

If you cannot afford a lawyer, one will be appointed to represent you free of cost to you before any questions if you wish. Okay.

Do you understand that?

[THE DEFENDANT]: Yes, sir.

DETECTIVE KOONTZ: Okay.

[THE DEFENDANT]: Okay. You say—say it one more time.

DETECTIVE KOONTZ: I'm sorry?

[THE DEFENDANT]: Say it one more time, please.

DETECTIVE KOONTZ: Read—you want me to read through all of them?

[THE DEFENDANT]: Yeah. Yeah.

DETECTIVE KOONTZ: Yeah. Okay. You have the right to remain silent. Anything you say can be used against you in a—in court or other proceedings. You have the right to talk to a lawyer for advice before we ask you any question, to have him or her with you here during questioning. If you cannot afford a lawyer, one will be appointed to represent you free of any cost to you. Do you understand that?

[THE DEFENDANT]: So am I supposed to pick one? Do I—

DETECTIVE KOONTZ: No it's just—I'm just letting you know what those are."

The defendant then initialed a document titled "Statement of Constitutional Rights and Waiver," which in part states, "I understand what my rights are, and I am willing to answer questions." During the interview, the defendant stated that his father, Sam, was a "distant family member." The morning of the offense, the defendant stated Sam was "worked up" about something, but the

4

defendant could not recall what, and that it did not seem like Sam was okay. The defendant said Sam asked the defendant questions and lectured him. The defendant said he could not recall the subsequent events because his thoughts were "boggled up." He stated that after he saw Sam's body, the defendant walked around outside the house for a while before returning, and then he remained inside until Rhonda arrived at the house.

¶ 9      The defendant stated that when Rhonda saw what had happened to Sam, she seemed afraid that the defendant would harm her. The defendant said he tried to calm Rhonda down while she was trying to make a telephone call but denied taking her phone. The defendant explained that when he reached out for Rhonda, he did not intend to push or harm her, he only meant to prevent her from using her phone. The defendant stated that he did not hear any gunshots and was unsure how Sam ended up on the ground, or what had happened. The defendant suggested that Sam may have been shot because he was "talking too much" to somebody, but the defendant reiterated that he did not know what happened to Sam. The defendant then invoked his right to counsel and the interview concluded.

¶ 10     The trial court found that the video showed the defendant had enough time to read the form, was read his rights twice, and waived them. Further, about 37 minutes into the interview, the trial court noted that the defendant invoked his right to an attorney, indicating that the defendant understood his rights. The motion to suppress was denied.

¶ 11     On April 5, 2021, the State filed a motion *in limine* to introduce evidence from Officer Schultze of the MVPD regarding motive. The State proffered that the defendant told Officer Schultze that he did not get along with Sam. The State argued that this statement, while inclusive of information revealing prior bad acts, was evidence of motive in the case. The defendant countered that the statement was vague and not sufficiently relevant to overcome its prejudicial

5

impact. The trial court granted the motion *in limine*, finding the statement was relevant and not "very prejudicial."

¶ 12 The matter proceeded to jury trial on September 15, 2021. Rhonda Wesley, Sam's girlfriend, testified that on May 12, 2020, the defendant and his children stayed the night at Sam's house. She stated the defendant had been "in and out" of Sam's house, and Sam wanted the defendant to find somewhere else to stay. Rhonda testified that on May 13, 2020, she left the house in Sam's car to run errands. The defendant and his children were in the house, and Sam was on the front porch. When Rhonda returned approximately 30 minutes later, she found Sam lying motionless on the ground with blood near his ear. He was holding a pistol in his right hand. Rhonda attempted to call the police, but the defendant walked out of the house, took her phone, grabbed her around her neck, and pulled her backwards. He took cigarettes out of her purse and walked back into the house. He then told Rhonda he was joking. Rhonda drove to the MVPD and reported what had happened. On cross-examination, Rhonda testified that in the weeks before Sam's death, the defendant had been staying "off and on" with Sam and Rhonda at their house. Rhonda stated that the defendant and his father would argue occasionally, but for the most part, got along. When asked if she returned home, Rhonda said she did not drive back to the house until she completed her errands.

¶ 13 Officer Schultze of the MVPD testified that in April 2020, he responded three times to a "verbal domestic" between the defendant and his partner. Officer Schultze stated, "There were three instances. The first time, it was a verbal domestic between the two. They were arguing. *** There was no physical altercation." The defendant then left the scene. Officer Schultze further testified, "About 30 minutes later, I respond again, and during this time, you know, still in effort to try to get the parties separated, I asked [the defendant's partner] if there is anywhere else [the

6

defendant] can go." Officer Schultze then asked the defendant "if he could go to his father's house, and he told me him and his dad don't get along."

¶ 14    MVPD officers testified that when they arrived at Sam's house on the day of the murder, the defendant went into Sam's house after being on the front porch and locked the door. The defendant opened the door when officers tried to forcibly enter but then struggled with officers while being detained. Evidence the MVPD collected from the house showed that Sam had been shot 13 to 15 times, and that shell casings were discovered near his body. The handgun used was purchased by the defendant several months prior, and ammunition was discovered in the defendant's car parked in front of Sam's house. A navy-blue jacket belonging to the defendant was found on a nearby chair after his arrest. A hat with the defendant's DNA was discovered in an alley near Sam's house, and testing of particle samples collected from the defendant's left hand showed a small amount of gunshot residue (GSR) was present.

¶ 15    Following his arrest, the defendant was transported to the MVPD and interviewed by Detective Koontz, while Detective Osborn observed. The video interview was played for the jury and admitted into evidence. The State presented footage from surveillance cameras located in the vicinity of Sam's house at the time of the murder and shortly after. The video footage showed a black man with dreadlocks in a blue jacket walking around the adjacent streets, yards, and alleys. MVPD Assistant Chief Brands testified that one of the video exhibits showed a man facing the camera wearing a jacket that was later recovered from Sam's home, which Assistant Chief Brands identified as the defendant's. Assistant Chief Brands also testified that the video footage showed Rhonda's vehicle drive past the house during the time she said she was running errands, despite her testimony that she remained at the store.

¶ 16    The State called Ronald Minks, a postal worker who was delivering mail in the area at the time of the murder. He testified to seeing a man walking around the neighborhood with a semiautomatic pistol in his hand. The man was a black man with dreadlocks and a blue jacket. The State asked Minks if he recognized the individual in surveillance footage captured after the murder, to which Minks stated that he did due to the clothing worn. Minks did not identify the man as the defendant during trial and was not directly asked to do so.

¶ 17    The State then called MPVD Detective Osborn, who testified to the custodial interview conducted after the defendant's arrest, which was consistent with his testimony during the motion to suppress statements hearing. Detective Osborn also stated that during the course of his investigation, he was made aware of several statements made by the defendant during jail visits and telephone or video calls. During a video call with his mother, on May 18, 2020, the defendant stated that he had found Sam on the ground, the defendant did not know if anyone else was at the house, and he believed it was a set up but did not explain why.

¶ 18    Detective Osborn further testified that during a jail visit between the defendant and his sister on May 17, 2020, the defendant stated that before the murder occurred, he told his children to go to the basement because he thought someone was going to kill him. His sister asked if he remembered anything else, and the defendant stated that he heard something that sounded like a knocking sound on wood. The defendant reiterated he did not know what happened, but said Sam told the defendant for the past few days that he needed "to go because of them," without explaining who he meant by "them."

¶ 19    The State called three forensic scientists to testify as experts for the physical evidence in the case. Susan Kidd was qualified as a forensic biologist, and she identified the procedures used to establish the defendant's DNA on the hat found near Sam's house. Angela Horn was qualified

8

as an expert in firearm identification, and she explained the procedures used to identify the firearm, bullets, and shell casings evidence provided in this case. Shan Mei Jones was qualified as an expert in trace chemistry. She identified the procedures used to test GSR samples provided by Rhonda and the defendant. The samples from Rhonda showed no GSR, and the defendant's samples showed GSR present on his left hand. The State then rested its case.

¶ 20 The defense called Damon Owens, who lived down the street from Sam. Owens testified that, on the day of the murder, he heard a loud noise, similar to a firecracker, and looked outside. He saw a man in the street who was running, possibly trying to "dodge stuff." Thirty minutes later, Owens heard a scream, went to the back door, and saw a heavyset black man reaching over a blonde woman and then heard the woman say something about a phone. The woman then got into a car and left. Owens testified that the man he saw in the street running was not the person he saw reaching over the woman.

¶ 21 On cross-examination, the State asked Owens if he recognized the defendant, and Owens said he did not. Owens also acknowledged that his recollection of the timing of the events may have been different from what he told MVPD officers previously. Owens was questioned concerning the view he had of Sam's house, including whether he looked out the window or the door, whether the door was clear or smudged, and whether Sam's house and the street in front of it were even visible from Owens's house. The defense submitted a recording of the MVPD's interview with Owens into evidence and rested its case.

¶ 22 During closing arguments, the State said that the defendant "told" what he did through his actions and words. The State argued that the defendant was the only person with the motive, means, and opportunity to commit the offense, and even though he consistently claimed that he did not know what had happened, he conceded that Sam's death might have been an accident. The State

also highlighted physical evidence connecting the defendant to the offense, such as the gunshot residue on the defendant's hand and that the defendant was the legal owner of the firearm that was used to kill Sam. The State further argued that the video surveillance corroborated the defendant's statements that he walked around the neighborhood near Sam's house, and then stated that the defendant was identified by a postal worker.

¶ 23    The defense stated during closing arguments that Sam did not want the defendant in the house due to potential danger, the defendant did not know what happened, and that he believed the offense to be a "setup." The defense noted that the defendant was in a state of shock during his interview and never admitted to shooting Sam.

¶ 24    The case was sent to the jury, which found the defendant guilty. The defendant filed a motion for new trial, which was denied. He was sentenced on December 16, 2021, to 70 years' imprisonment for first degree murder and 5 years' imprisonment for robbery, to be served consecutively. The trial court denied the defendant's motion to reconsider sentence, and the defendant timely appealed.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, the defendant's opening brief lists three issues for this court's review. Upon review of the defendant's arguments under these issues, we find that these issues incorporate arguments that are more efficiently and appropriately addressed as separate issues. Therefore, we find that the defendant raises five issues for this court's consideration.

¶ 27    The defendant abandoned his argument that improper lay identification testimony was admitted in his rebuttal brief. "[W]hen a party withdraws an issue in a reply brief, he or she concedes that the other side is correct or that a subsequent decision has resolved the issue." *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 119. As such, we will not address this issue further.

10

¶ 28 The defendant's remaining issues are that the trial court erred in (1) denying the defendant's motion to suppress statements; (2) allowing improper character evidence; (3) allowing prosecutorial misconduct in closing arguments; and (4) that due to the cumulative effect of these alleged errors, the defendant was deprived of his due process right to a fair trial. We will proceed with our analysis of the issues in the order listed.

¶ 29 A. Motion to Suppress Statements

¶ 30 On appeal, the defendant first argues that the trial court erred by denying his motion to suppress statements. The defendant claims that his custodial statements to police were involuntary where his demeanor indicated that he was confused and in a "charged emotional state," and where his *Miranda* waiver was not made voluntarily, knowingly, or intelligently. Specifically, the defendant argues that his *Miranda* waiver was ineffective where he (1) was informed he was in custody for obstructing and battery; (2) was not informed that he would be questioned regarding his father's murder; (3) did not indicate that he understood his *Miranda* warnings; (4) did not verbally waive his rights; (5) was misinformed about the nature of the form he signed; and (6) was rushed through the waiver process.

¶ 31 The State responds that the trial court did not err in denying the motion to suppress where the defendant's statements were made voluntarily after the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. The State notes that the detective read the defendant his *Miranda* rights twice, and that the defendant had time to review the waiver form before signing. The State further argues that the defendant later invoked his right to counsel, which indicated that he understood his rights.

¶ 32 We review a ruling on a motion to suppress evidence under a two-part standard of review. *People v. Quevedo*, 403 Ill. App. 3d 282, 292 (2010). We first review the trial court's factual

11

findings under a manifest weight of the evidence standard, while the ultimate question of whether the defendant's waiver was voluntary is reviewed *de novo*. *People v. Soto*, 2017 IL App (1st) 140893, ¶ 69; *People v. Goins*, 2013 IL App (1st) 113201, ¶ 47. In this case, the court relied on a video recording of the defendant's custodial interview, which this court has also viewed. Any discrepancies between that video and the officer's testimony must be resolved in favor of what the video shows. *Id.*

¶ 33 Neither party disputes that the defendant was subject to a custodial interrogation. A custodial statement may be admitted into evidence where the statement was voluntary. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). "[T]he test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). In making this determination, we consider the totality of the circumstances surrounding the statement, including the defendant's age, intelligence, education, experience, mental capacity, education, and physical condition at the time of questioning. *People v. Salamon*, 2022 IL 125722, ¶ 81. In addition, courts consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises. *Id.* Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2020); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 34 The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *People v. Reid*, 136 Ill. 2d 27, 54 (1990). In *Miranda*, the United States Supreme Court held that, prior to

12

the start of a custodial interrogation, a person being questioned by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. The *Miranda* warnings are the procedural safeguards that help protect the privilege against self-incrimination. *Colorado v. Spring*, 479 U.S. 564, 572 (1987). Any statements obtained in derogation of those rights are inadmissible in a later criminal prosecution unless those rights were voluntarily, knowingly, and intelligently waived. *Goins*, 2013 IL App (1st) 113201, ¶ 48. A defendant validly waives *Miranda* when he or she (1) freely and deliberately (voluntarily) relinquishes the right and (2) is fully aware of both the nature of the right being abandoned and the consequences of the decision to do so. *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009). The State has the burden of proving the validity of a *Miranda* waiver by a preponderance of the evidence, and if the State makes a *prima facie* case, the burden shifts to the defendant to show that his waiver was not knowing and intelligent. *Id.*

¶ 35    The evidence adduced at the hearing on the motion to suppress established that after the defendant was arrested at the victim's house, he was transported to the MVPD, where he was interviewed by Detective Koontz, while Detective Osborn observed. The defendant was advised that he was in custody and was read his rights pursuant to *Miranda* twice. The defendant initialed the *Miranda* form after being given an opportunity to review the same. He was never threatened or coerced, and the parties were calm as they talked. At the time of the interview, the defendant was 30 years old, had no health issues, and had attended college for two and a half years. The defendant was questioned for approximately 40 minutes and did not appear to be under the influence of alcohol or drugs. The interview was ultimately terminated when the defendant

13

requested an attorney. The defendant's *Miranda* waiver form was entered into evidence and contained the defendant's initials.

¶ 36 The defendant argues that during his interrogation, he demonstrated a charged emotional state and confusion, where he indicated that he could not remember what happened and expressed that his thoughts were "boggled up." Additionally, the defendant points out that he misstated his father's gender and their relationship when asked about his father, and he said, "she's like a—like a distant family member." Thus, the defendant argues his emotional state and demonstrated confusion rendered his statement and *Miranda* waiver involuntary.

¶ 37 After the defendant was read his *Miranda* rights the first time, he indicated that he understood his rights by stating "[y]es." While he asked if he should "pick one" after the second reading, the statement could be interpreted as an inquiry as to how he might select an attorney should he desire one. Although the defendant may have been emotionally overwhelmed from the events of the day, he was able to understand questions, communicate, read, write, and most importantly, invoke his right to an attorney thus ending the interrogation.

¶ 38 The defendant's questions and demeanor did not render the defendant's statements to police involuntary, nor did they render his waiver ineffective. A knowing and intelligent waiver requires the "ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights ***." *People v. Bernasco*, 138 Ill. 2d 349, 363 (1990). While the defendant may have shown some instances of confusion, that does not mean the defendant could not understand the words used in the *Miranda* warnings. The defendant invoked his right to counsel after a relatively short period of questioning, indicating that he understood his rights. See *People v. Thomas*, 2020 IL App (1st) 170310, ¶ 34 (defendant's request for counsel showed some understanding of *Miranda* rights).

14

¶ 39   The defendant next argues that where he did not verbally waive his rights, his waiver was not knowing and intelligent. A defendant is not required to verbally waive his rights where he signed a *Miranda* waiver. See *People v. Patton*, 33 Ill. App. 3d 923, 926 (1975) (waiver form signed by the defendant was positive evidence that he had been informed of his constitutional rights and desired to waive those rights). The defendant initialed the form.

¶ 40   The defendant also argues that he was misinformed as to the nature of the form he signed, and that the detective downplayed the importance of the waiver and rushed him into signing his *Miranda* waiver. Detective Koontz read the defendant his *Miranda* rights twice, handed the defendant the waiver form to sign, and the defendant had an opportunity to review the form. Detective Koontz did not direct the defendant to hurry or rush him in any way. Detective Koontz told the defendant that by signing the form, he was acknowledging that Detective Koontz had read his rights to him. The defendant was informed of his rights before signing the waiver, and Detective Koontz answered the defendant's questions to the best of his ability, which did not downplay the importance of the waiver. The trial court found that the defendant "had plenty of time to read 'I understand what my rights are and I am willing to answer questions,' " which was clearly written in the form.

¶ 41   The defendant next challenges the voluntary nature of his waiver where he was informed that he was in custody for obstructing justice and battery, but not informed that he would be questioned regarding his father's murder. The defendant was arrested at his father's home, where his father had been shot and killed. Any reasonable person would believe that questions about what happened at the home that day would be posed by investigators. A defendant's awareness, however, of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether he voluntarily, knowingly, and intelligently waived his constitutional rights.

15

*Colorado*, 479 U.S. at 577. The fact that the defendant was truthfully informed of the crimes for which he was already arrested at the time of questioning and not informed of the intended line of questioning related to his father's death does not render his otherwise knowing and intelligent waiver invalid, or his statements involuntary.

¶ 42   In denying the defendant's motion to suppress statements, the trial court considered all of the relevant evidence before it when determining whether the defendant's statements and *Miranda* waiver were voluntary and whether the defendant's *Miranda* waiver was knowing and intelligent. The trial court found that the evidence established that the defendant's statements were made freely, voluntarily, and without compulsion or inducement of any sort, and that the defendant's will was not overcome. The trial court found that the defendant's statement was voluntary and that his waiver was made knowingly and intelligently in part because, "If there is any question about his understanding at some point, at 37 or 38 minutes in he invoked his right to an attorney which tells me that he certainly understood that part of it." Based upon our review of the record, the opposite conclusion to the trial court's factual findings and credibility determinations are not evident, nor were the trial court's findings unreasonable, arbitrary, or not based on the evidence. Consequently, we find that the trial court's factual findings, including that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, were not against the manifest weight of the evidence.

¶ 43   We further find, based on our *de novo* review, that the defendant's waiver was voluntary and that the trial court did not err in denying the defendant's motion to suppress, where on the facts of this case, there was no constitutional violation warranting suppression of the evidence.

¶ 44                          B. Defendant's Other Bad Acts

¶ 45    The defendant next argues that the trial court erred in granting the State's motion *in limine*, filed pursuant to Illinois Rule of Evidence 404(c) (eff. Jan. 1, 2011), to admit evidence of the defendant's statement to Officer Schultze that he did not get along with his father. The circumstances surrounding the making of the statement included the fact that approximately a month prior to the murder, Officer Schultze responded to the defendant's home three times due to a verbal domestic dispute. The defendant made the statement to Officer Schultze in response to his suggestion that the defendant could stay with his father that evening to avoid any further issues.

¶ 46    The State argues that the evidence of the defendant's statement and the surrounding context was admissible for the purpose of proving motive. The State further points out that the jury was instructed to only consider the testimony as to motive and not for any other reason, so any risk of undue prejudice was minimized.

¶ 47    The defendant argued at the motion hearing that the evidence was irrelevant to motive, and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The defendant argues on appeal that, had the jury not known that the defendant was involved in multiple "potentially violent" domestic altercations with someone other than his father, it may have reached a different verdict.

¶ 48    A motion *in limine* is addressed to the trial court's inherent power to admit or exclude evidence. A reviewing court will not reverse a trial court's grant or denial of a motion *in limine* absent a clear abuse of discretion. *People v. Williams*, 188 Ill. 2d 365, 369 (1999). An abuse of discretion will be found only where the ruling of the trial court is arbitrary, fanciful, unreasonable, or where no reasonable person would take the court's adopted view. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 49   Generally, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). This evidence, referred to as other-crimes evidence or other-act evidence, is not considered irrelevant; instead, it is objectionable because such evidence has "too much" probative value. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Rule 404(b) protects the defendant's right to have his guilt or innocence evaluated solely on the basis of the charged crime. *Id.*

¶ 50   Evidence of other crimes, wrongs, or acts may, however, be admitted for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Pikes*, 2013 IL 115171, ¶¶ 11, 14. Rule 404(b) does not act as a categorical bar to the admission of other-crimes evidence but is intended to guard against the jury impermissibly relying on the evidence to determine that the defendant had committed an earlier crime, and therefore, he must have committed this one. Where the other-crimes evidence has no value beyond that inference, it is excluded. *People v. Ross*, 2018 IL App (2d) 161079, ¶ 165.

¶ 51   Other-crimes evidence is also subject to other evidentiary rules, such as the requirement that the evidence be relevant. Evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 52    At trial, Officer Schultze was questioned about the defendant's statement and the circumstances surrounding the making of the same. Officer Schultze testified that on April 19, 2020, he responded to an address for a "verbal domestic" between the defendant and his partner. Officer Schultze responded to the address on three times that day. The first time was for the verbal domestic, where the two were arguing. There was no physical altercation. Officer Schultze wanted to separate the two, and the defendant ended up walking away and leaving the scene. At that point, Officer Schultze believed that the issue was resolved. He testified that 30 minutes later, he was called back to the residence, at which point he asked the defendant if he could go to his father's house. The defendant responded that he and his father did not get along.

¶ 53    The State's theory of the case was that the evidence that the defendant stated he and his father did not get along and the police responses to arguments between the defendant and his partner went to motive. The State further highlighted that the defendant, during his interrogation, described his father as a distant family member. The State played a portion of the defendant's interrogation where he said, in reference to his father: "Every time I talk to him, it's not right."

¶ 54    In further support of its theory of motive, the State presented evidence that the defendant and his children had been staying for a few days with his father. In a phone call while incarcerated, the defendant told his sister that while staying with his father, Sam had been telling the defendant to leave the residence for a few days. The State argued that this evidence showed that the two had a bad relationship and were not connected as a father and son should be.

¶ 55    Based on this combined evidence, the State argued that the defendant had a motive to kill his father. The defendant and his partner had been arguing in April 2020, which was relevant because it explained why the defendant and his children were staying at his father's house and it described the circumstances under which the defendant's statement that he and his father did not

19

get along was made. The defendant's statement that he could not stay at his father's house because they did not get along was relevant because it was a statement of the defendant which lent insight into the nature of their relationship around the time of the murder. The State's position, with respect to the defendant's motive, was that he needed a place to stay with his children, and his father, whom he did not get along with, was pushing him away.

¶ 56   The State did not argue that the disputes implied that the defendant had a violent nature, and Officer Schultze stated that the initial dispute was only verbal. The defendant argues that while Officer Schultze testified that the first response to the defendant and his partner was for a verbal altercation, the officer did not clarify that the remaining two visits were for verbal altercations. Upon reviewing the testimony from Officer Schultze, he stated, "I responded to *** a verbal domestic between [the defendant] and [his partner]." He continued describing the altercation between the parties and the officers' attempts to separate them to resolve the issue. Officer Schultze did not testify that any of the visits that day were in response to violence and classified the altercation as a "verbal domestic." Officer Schultze never indicated that the defendant had committed a crime and, instead of being arrested, he attempted to separate the parties, further indicating no crime had been committed. At most, the evidence indicated that the defendant had ongoing verbal arguments with his partner on the particular day.

¶ 57   In light of the evidence that the defendant had been in a verbal dispute with his partner approximately a month prior to staying with his father for a few days, that he needed a place to stay, and that he did not get along with his father and his father was "pushing him out," we cannot find that the trial court's decision to admit the evidence of the verbal altercations was arbitrary or fanciful. Officer Schultze's testimony about the police responses on that day was relevant, in that it helped explain both the making of the statement that the defendant did not get along with his

20

father and a possible reason that the defendant needed a place to stay. Both the defendant's relationship with the victim and the circumstances for the making of the statement were relevant to the State's theory about motive. The trial court found that the probative value of the evidence was not substantially outweighed by its prejudicial effect, and we cannot disagree. Additionally, the jury was given a limiting instruction to only consider the testimony on the issue of the defendant's motive. As such, any danger of undue prejudice was minimized. See *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.").

¶ 58 For the foregoing reasons, we are not persuaded by the defendant's claim that the admission of the defendant's statement and the police response to arguments between the defendant and his partner was arbitrary, fanciful, unreasonable, or that no reasonable person would take the view adopted by the trial court. Thus, we cannot say that the trial court abused its discretion in granting the State's motion *in limine* and admitting the testimony at trial.

¶ 59 C. Prosecutorial Misconduct

¶ 60 Next, the defendant asserts that during closing arguments, the State committed prosecutorial misconduct when it improperly misstated the evidence at trial, shifted the burden of proof to the defendant, improperly vouched for evidence that was not admitted at trial, and mocked the defense. The defendant acknowledges there was no objection to these statements at trial and that he did not include the alleged errors in his posttrial motion. The issue is therefore forfeited. See *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 30.

¶ 61 The defendant, however, invokes the plain error exception to the forfeiture rule. Normally, a court will only excuse forfeiture of errors concerning comments made at trial where the comments were so inflammatory that the defendant could not have received a fair trial or so

21

flagrant as to threaten the deterioration of the judicial process. *People v. Sims*, 192 Ill. 2d 592, 637 (2000). The defendant argues that second prong plain error applies, which permits this court to consider unpreserved error if an error occurred that is so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The burden of persuasion lies with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The first step in plain error review is to determine whether an error occurred at all. *Piatkowski*, 225 Ill. 2d at 565.

¶ 62    Defendants arguing for reversal of their conviction based upon improper closing argument face a difficult burden. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48. Improper remarks made during closing argument warrant reversal only if those remarks resulted in substantial prejudice to the defendant. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 48. Substantial prejudice occurs if the improper remarks constitute a material factor in the defendant's conviction. *Id.* If we determine the remarks were not a material factor in the outcome of the trial, the "defendant cannot meet his burden of demonstrating a reasonable probability of a different result." *Holmon*, 2019 IL App (5th) 160207, ¶ 53. While it is difficult to overturn a conviction based solely on improper remarks during closing arguments, improper arguments may be prejudicial enough to undermine a defendant's substantial rights if the prosecutor's remarks have the "effect of undermining the entire trial." *People v. Brooks*, 345 Ill. App. 3d 945, 953 (2004).

¶ 63    Prosecutors are generally afforded wide latitude during closing argument. *Holmon*, 2019 IL App (5th) 160207, ¶ 49. They "may comment on the evidence and on any fair and reasonable inference the evidence may yield." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). In reviewing allegations of prosecutorial misconduct in closing arguments, we must examine the State's and the defendant's closing arguments in their entirety and consider the complained-of comments in their

22

proper context. *People v. Rush*, 294 Ill. App. 3d 334, 340 (1998). The challenged remarks must also be considered in the context of the trial court's instructions that arguments are not evidence, that the State bears the burden of proving the defendant's guilt beyond a reasonable doubt, and that the defendant need not prove his innocence. *People v. Williams*, 2022 IL 126918, ¶ 44.

¶ 64 Here, the defendant first argues that the following statements made by the State during its closing arguments were improper because they misstated the evidence at trial:

(1) "remember in the front of your mind that the defendant told you he did it. He told you with his words. He told you with his actions, and my opening remarks are going to be very heavy on his statement to Detective Koontz and Detective Osborn. He told you that he did it. He talked about his relationship with his father, and he described him as a distant family member."

(2) "He also told you he was the only one with the opportunity to commit this crime on the morning of May 13, 2020."

(3) "What did Ron Minks say? What did he tell you? He said the defendant had a gun; that he saw him walk by him with that gun. I'm not going to mess with it. You can watch the video of him walking down Cherry Street when he comes back out of the alley and heads back to his home."

(4) "The only reasonable explanation is that the gunshot residue came from the 12 shots from the gun Ron Minks saw [the defendant] carrying."

(5) "the mailman saw him with it. *** Ron Minks runs into officers before he can get back to his vehicle, tells them what he saw, and then goes to the police station and identifies the video."

23

(6) "There is an eyewitness account of the defendant carrying a black handgun down Cherry Street after the shooting and apparent flight."

¶ 65    During closing arguments, the prosecution is barred from misstating the law or facts of the case, from making remarks that diminish their burden of proof, or from commenting on factual matters not based on the evidence. *People v. Roach*, 213 Ill. App. 3d 119, 124-25 (1991). The defendant argues that the State misstated the facts of the case by making the above comments regarding the defendant telling the jury that he committed the crime. There was no evidence offered at trial that the defendant confessed or literally told anyone that he killed his father.

¶ 66    The State's comments during closing arguments that the "defendant told you he did it" *with his words and actions*, taken in context with the entire closing argument, was an invitation for the trier of fact to draw reasonable inferences from the defendant's words and actions. The State did not argue that the defendant literally confessed to the murder; it argued that the jury could determine that the defendant was guilty through the specific examples offered of the defendant's statements and actions prior to and after the murder. The State played numerous clips of the defendant's own words from his interview and various jail calls with his family. Before each clip the State introduced, it discussed the inference it was asking the jury to draw from the evidence presented. The State's argument was that, while "[the defendant] didn't say 'I pulled the trigger' in that interview, he told you why he did." The State played a series of clips and argued that the defendant provided evidence that implicated himself when he, *inter alia*, told the jury that he did not have a close relationship with his father, that he had a difficult time talking to his father, that his father was telling him he had to go, and that he did not see anyone else at the home at the time of the murder. The State highlighted the defendant's comment that he and his father talked that

24

morning, and that his father said something "slick" to him, but not "tough." The State argued that "the evidence showed what was going on."

¶ 67    The defendant also argues that the State misstated the evidence in its discussion regarding Ron Minks identifying the defendant. Ron Minks did not know the defendant, and he did not identify him *per se*. Ron Minks testified that on May 13, 2020, he was delivering mail in the area of the murder and observed a black male in a dark blue shirt hoodie with dreadlocks walk past him, and in the man's right hand he carried a black semiautomatic handgun. He continued to observe the man walking up Cherry Street towards 17th Street, where he lost sight of him in the alley between 17th and 18th Streets. When he returned to his vehicle, he told responding officers what he saw. Ron Minks then looked at People's exhibit 39, a surveillance video which showed an individual walking down the street. Ron Minks testified that he recognized the individual by the blue jacket or hoodie.

¶ 68    Detective Osborn testified that he had reviewed surveillance video from a street camera in the area of the murder with Ron Minks during his investigation. The portion of the video reviewed depicted a man walking westbound in the 1500 and 1700 blocks of Cherry Street. Detective Osborn testified that he "showed [Ron Minks] the images of the suspect so he could identify that that was the same suspect he had seen on May 13 walking westbound on Cherry Street." Ron Minks indicated that it was.

¶ 69    Detective Koontz testified that when they arrived at the scene of the murder and arrested the defendant, "there was a blue jacket inside the house that matched the description of the jacket that the mail carrier had identified and the cameras had seen the defendant wearing." The blue jacket was found in the dining room hanging on the back of a chair and was introduced as People's exhibit 19.

25

¶ 70    Assistant Chief Brands testified that he reviewed video from street cameras in the area and identified the defendant walking around the neighborhood. Assistant Chief Brands also identified Ron Minks walking in the neighborhood at the same time. Assistant Chief Brands identified the individual in the blue jacket depicted in the video as the defendant by his appearance and by his jacket, which was blue and gray with a marking on the left chest. People's exhibit 19 was introduced into evidence. The jury had the opportunity to view the video the State purported to depict the defendant, who was present in court and to compare the defendant, and the clothing collected from him, to the exhibits and the individual depicted in the video.

¶ 71    While Ron Minks did not identify the black man with dreadlocks and a blue jacket he saw walking on Cherry Street at the time he was delivering mail as the defendant, he identified the man depicted on video surveillance from street cameras as the man that he saw. The man depicted on the video surveillance from the street cameras matching that description had been identified as the defendant. Defense counsel, at trial, admitted that the defendant was identified in the footage, thus inviting, or at least agreeing to, the identification.

¶ 72    When viewing the context of the closing argument as a whole and the evidence presented at trial, the prosecutor's remarks were neither substantially prejudicial to the defendant nor material to his conviction. We do not find error in the State's comments; however, if error occurred, it was not reversible error. Accordingly, the contested prosecutorial remarks during the State's closing arguments did not constitute reversible error.

¶ 73    Next, the defendant argues that the State made several improper arguments which improperly shifted the burden of proof where it stated:

> (1) the defendant "never put anybody else in that residence";

(2) "[t]here was never a suggestion to the police somebody else may have done this. There was never a question from [the defendant] to the detectives about stop messing with me. Go find the guy that did this. Never a suggestion of anybody else. Never a suggestion of an alternate suspect"; and

(3) with regard to the "them" the defendant was referring to in the clip while talking to his sister "[t]here was more of that call. If counsel believed I was misrepresenting who he was talking to, he could have played the rest of the call, but it was clear from what he said that he was referring to Rhonda."

¶ 74 Defense counsel, during cross-examination of Assistant Chief Brands, highlighted other figures or vehicles in the area of the murder caught on the street cameras' video recordings. The defense also called Damon Owens, who testified that he saw an individual on Cherry Street dressed in black directly after he heard what he thought were fireworks. Later he saw a blonde woman arrive back at 1820 Cherry Street, and he saw a heavyset black man with no shirt on grab her and saw her eventually run to a red car and drive off. Owens testified that the two individuals were not the same man. The defense theory of the case was that someone other than the defendant shot his father.

¶ 75 While it is improper for the State to argue facts not in evidence (*Johnson*, 2023 IL App (5th) 190426-B, ¶ 33), it was clear from the questioning at trial that the defense theory of the case was that it was someone other than the defendant, maybe the man in black that Damon Owens saw in the street, a man in white seen briefly on the video of Cherry Street, or someone else entirely. The evidence presented by the defense was clearly an attempt to imply that someone else killed the victim.

¶ 76    Thus, the State's remarks were offered in response to the defendant's theory of the case. "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). The defendant's case implied that someone else, possibly the man in black or the figure in white, killed the victim. The State's comments point out that the defendant, who was in the home with his father at the time he was shot multiple times, never told police there was anyone else in the residence and never suggested police find the rightful perpetrator during his interview.

¶ 77    These comments were not an attempt to shift the burden of proof to the defendant, but rather, were arguments regarding the evidence, and the inferences that one could make from the defendant's interview, and in response to the defendant's theory of the case. Thus, we do not find that they were improper. Even if the State's comments were somehow improper, the jury instructions stated that the burden of proving the guilt of the defendant beyond a reasonable doubt remains on the State throughout the case and the State's comments did not substantially prejudice the defendant in a manner that resulted in depriving the defendant of a fair trial.

¶ 78    Next, the defendant argues that part of the State's closing argument improperly shifted the burden of proof to the defense when it implied the defendant needed to offer certain video evidence. In closing, the State discussed a call that was played for the jury of the defendant speaking with his sister at the jail. The defendant had said "And then, Pops was, you know, like, he was just telling me, like, I don't know. He was basically, like, the last three or four—three or few days telling me to go because of them. I don't know." The State argued the statement went to motive. Defense counsel argued that the "them" the defendant was talking about was unclear. Defense counsel stated, in closing, "Well, who is them? Who is them? The State's evidence on this point is not clear at all; especially, for a party that bears the burden of carrying proof beyond

28

a reasonable doubt. But what is clear is [the defendant] did not say because of me." Defense counsel continued: "Is [the defendant] talking about his kids when he's talking about them, or is he talking about someone else? The State's case for motive is not clear on this point." In rebuttal, the State made the comment, in response to the defendant's argument, that defense counsel could have played the rest of the call. The State then vouched that it was clear from what the defendant said that he was referring to Rhonda. The defendant argues on appeal that the comment shifted the burden of proof and improperly vouched for evidence not introduced at trial.

¶ 79     The defense is not required to produce any evidence, and the prosecution cannot attempt to shift the burden of proof to the defense. *People v. Curry*, 2013 IL App (4th) 120724, ¶ 80. The prosecution, however, does not shift the burden of proof when it "respond[s] to comments by defense counsel that clearly invite a response." *Id.* For example, "a prosecutor is permitted to comment on a defendant's failure to produce evidence where a defendant with equal access to the evidence assails the prosecutor's failure to produce that evidence." *Id.* We do not find that the State improperly shifted the burden of proof to the defendant in this exchange.

¶ 80     The State did, however, make an impermissible implication that he knew something that the jury did not, by referencing a portion of a video exhibit that was not played for the jury, and thus, was not in evidence. See *People v. Williams*, 2015 IL App (1st) 122745, ¶ 18. The State indicated to the jury that facts outside of the record made his theory of what the defendant meant by "them" more likely. See *id.* (citing *United States v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001) (explaining that improper vouching can stem from an implied guarantee of truthfulness based on facts outside the record)). As such, we find that the State made an improper argument by vouching for a portion of a video exhibit that was not in evidence.

¶ 81    After determining that the argument was improper, we must address whether the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 68. There was not strong evidence of a motive for the defendant to kill his father. What circumstantial evidence was presented for motive, however, had little to do with who "them" was referring to in the defendant's statement. What the defendant meant by "them" is of little import to the issue. Defense counsel argued that "them" did not mean the defendant, but could have meant Rhonda, the children, or someone else. As it relates to motive, the operative portion of the defendant's statement was that the defendant's father was telling the defendant he had to go. The State was not arguing that the defendant was angry based on whose fault it was that his father was telling him to go. The improper marks were of minimal importance to any contentious point at trial, and thus do not rise to the level implicating a contrary verdict. We find that the improper remarks did not contribute to the defendant's conviction and, as such, they do not constitute reversible error.

¶ 82    Finally, the defendant argues that the State improperly mocked the defense by stating, "I thought they were going to argue Rhonda Wesley did it from the grassy knoll *** maybe they're going to say the couch did it and that because there is gunshot residue on the couch, the couch did it." Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create a reasonable doubt by confusion, misrepresentation, or deception. *People v. Johnson*, 208 Ill. 2d 53, 82 (2003). While we agree with the defendant that the prosecutor's use of language went beyond responding to the matters raised by defense counsel, we do not consider this comment to have been unduly prejudicial such that it would have affected the verdict in this case. Consequently, we conclude that this remark does not constitute reversible error.

¶ 83    Although the prosecutor made improper remarks during closing argument, we do not find that individually, or in combination, the comments warrant reversal. The errors were not so egregious as to deny the defendant a fair trial or challenge the integrity of the judicial process. Therefore, the defendant has failed to meet his burden of persuasion, and the procedural default of forfeiture applies.

¶ 84                              D. Cumulative Error

¶ 85    The defendant's final argument is that the trial court's alleged errors resulted in the cumulative effect of denying the defendant a fair trial. As such, the defendant argues that reversal is necessary even if no individual error requires reversal. This argument is moot since we have found no error in the trial court's rulings on the defendant's motion to suppress statements, admittance of certain evidence at trial, and any errors in the State's closing argument would not amount to reversible error when considered together.

¶ 86                              III. CONCLUSION

¶ 87    For the foregoing reasons, we find that the trial court did not err in denying the defendant's motion to suppress statements, the admittance of prior bad acts testimony was not an abuse of discretion, and the prosecutor's closing argument did not result in reversible error. Therefore, we affirm the defendant's conviction.

¶ 88    Affirmed.