NOTICE
Decision filed 11/10/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231344-U

NO. 5-23-1344

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-157 |
| | ) | |
| JUNIOR H. NYANGUILE, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's *pro se* postconviction petition was properly dismissed at the first stage of the postconviction proceedings as his argument that his trial counsel was ineffective for failing to seek to suppress his postarrest statements was positively rebutted by the record on appeal.

¶ 2    This appeal arises from the summary dismissal of a *pro se* petition that the defendant, Junior H. Nyanguile, filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). The defendant contends that his petition should not have been summarily dismissed because it raised at least an arguable claim that his trial counsel was ineffective for failing to file a motion to suppress statements that he made to police in violation of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). For the reasons below, we affirm the judgment of the circuit court of Champaign County.

1

¶ 3                    I. BACKGROUND

¶ 4    In February 2020, the State charged the defendant with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)) and one count of criminal sexual abuse (*id.* § 11-1.50(a)(1)) for committing acts of sexual penetration and an act of sexual conduct against Jaquetta N. The State alleged that, by the use of force, the defendant placed his fingers and penis inside Jaquetta's vagina and also licked Jaquetta's nipple. At the defendant's March 2021 jury trial, evidence showed that the defendant was born in the Democratic Republic of the Congo. The defendant spoke French, Lingala, and Swahili, and he learned to speak English when he moved to the United States approximately five years earlier. During the trial, he was assisted by a French interpreter.

¶ 5    Jaquetta testified that she was originally from Nebraska, and in June 2019, she moved to Illinois with her three-year-old twins. She began working for a factory, and the defendant was a coworker. Jaquetta and the defendant became friends, and in August 2019, they made plans to hang out at the defendant's apartment. Jaquetta described the defendant's apartment as a "student housing situation" with one common area and multiple bedrooms. Jaquetta explained that since they intended to smoke marijuana, the defendant suggested that they hang out in his bedroom. In the bedroom, the defendant sat on the edge of his bed while Jaquetta sat in a chair at the defendant's desk. They smoked marijuana, and the defendant drank vodka. Jaquetta testified that she only spoke English but had no problems communicating with the defendant. She estimated that she was at the defendant's apartment for one to two hours. During that time, the defendant acted flirtatiously by caressing her thigh, shoulder, head, and hair. Jaquetta noted that the defendant's actions made her uncomfortable because that was their first time hanging out, and he had not previously displayed this behavior when she had given him a ride home after work.

¶ 6     At some point, Jaquetta decided to leave to pick up her children from the Crisis Nursery. When she told the defendant that she was leaving, the defendant reached for her and pulled her on top of him on the bed. Jaquetta initially thought that the defendant was being flirtatious and joking around. She struggled and repeatedly told the defendant "no" and that she needed to leave to pick up her children. Eventually, the defendant got on top of her and pinned her hands above her head. At this point, Jaquetta realized that the defendant was "trying to rape [her]."

¶ 7     Jaquetta was wearing a T-shirt, baggy jean shorts, and no underwear. While Jaquetta's hands were pinned down, the defendant pulled the leg of her shorts to the side and inserted his finger into her vagina. The defendant then unbuckled his belt, placed his penis inside her vagina, and ejaculated. Throughout the entire encounter, Jaquetta told the defendant "no" and that she needed to leave. She estimated that she said "no" or "stop" to the defendant over 20 times. However, Jaquetta was concerned that if she fought back, the defendant might hurt her. She also believed that she heard others inside the apartment, but she did not scream because she did not know if those people would help her or help the defendant.

¶ 8     Following the encounter, Jaquetta sat on the edge of the bed "in a daze" while the defendant used the bathroom. When the defendant returned to the bedroom, he asked Jaquetta if she was okay. Jaquetta did not respond and left the apartment. She described herself as being upset and in tears. After leaving the apartment, she drove to the nursery to pick up her children. At the nursery, she explained what had occurred with the defendant, and the staff called the police. The police arrived, and they took her to the hospital. At the hospital, swabs were taken from various parts of her body, including her vagina. She stated that her breast area was also swabbed because the defendant had licked her there.

3

¶ 9    Jaquetta explained that she had a specific time frame to pick up her children from the nursery. She also explained that the defendant put her in a "serious predicament" because she could have "lost" her children by being late to pick them up from the nursery.

¶ 10    On cross-examination, Jaquetta explained that the nursery had a policy of contacting the Department of Children and Family Services (DCFS) when children left in their care were not picked up on time. She did not recall if she was late to pick up her children, but she remembered that it was close to the time that she was supposed to pick them up. She acknowledged telling the police that when the incident with the defendant was occurring, she heard her phone ringing and believed that it was the nursery calling because she was late to pick up her children. She also acknowledged that she washed her hands and gargled with mouthwash before leaving the defendant's apartment because she did not want to smell like marijuana when she arrived at the nursery.

¶ 11    Also, Jaquetta acknowledged that she had given the defendant a ride home from work one or two times before the incident. She may have told police that during the rides, the defendant was a "little touchy but nothing too overbearing." She admitted telling the police that the defendant had previously rubbed her shoulder, tried to kiss her on the cheek, and pointed out her dimples. However, she maintained that during the car rides, the defendant did not display behavior like the behavior that he had displayed in his bedroom.

¶ 12    David Roesch, a detective with the Urbana Police Department, testified that on September 16, 2019, he interviewed the defendant at the police department. This interview was audio and video recorded and played for the jury. Detective Roesch described the defendant as having an accent, but Detective Roesch asserted that he did not have difficulty communicating with the defendant. Detective Roesch began the interview by asking the defendant about the language that

4

the defendant spoke, and the defendant indicated that he spoke French and identified English as his second language. Detective Roesch instructed the defendant to interrupt if he had difficulty understanding, and the defendant acknowledged that he would ask questions if he did not understand something. The defendant also indicated that he did not need an interpreter "right now." During the interview, the defendant denied having sex with Jaquetta, and the defendant claimed that the extent of their physical contact was hugging. The defendant acknowledged that Jaquetta was at his house on the day in question for approximately 20 minutes but denied that they had sex. Detective Roesch told the defendant that Jaquetta reported that the defendant "forced her to have sex." The defendant denied that he had done so and stated that he did not know why she would say that. The defendant maintained that he only hugged Jaquetta and that Jaquetta sat on the chair while he stayed on the bed. The defendant also stated that both he and Jaquetta remained fully clothed while she was there. Detective Roesch obtained the defendant's permission to swab the defendant's cheek for DNA.

¶ 13 At some point in the interview, Detective Roesch indicated that he did not believe that the defendant was being completely honest about what happened at the defendant's apartment on the day in question. Thus, Detective Roesch read the defendant his *Miranda* rights. As Detective Roesch read the *Miranda* rights, Detective Roesch asked the defendant if the defendant understood each one, and the defendant indicated that he understood each one. Then, toward the end of the interview, the defendant indicated that because of the language differences between him and Detective Roesch, he did not understand what Detective Roesch meant when Detective Roesch said "force" and "have sex." The defendant noted that sex in French meant different things, including hugging and kissing. Detective Roesch then explained that "having sex" meant putting

5

a penis inside a vagina and asked the defendant if he put his penis in Jaquetta's vagina. The defendant continued to assert that such an act had not occurred.

¶ 14    The parties stipulated that forensic testing ultimately showed male DNA was detected in Jaquetta's vaginal swab, and the DNA matched the defendant's DNA profile at all 23 points of comparison, which was a statistical frequency of 1 in 26 nonillion. In addition, swabs taken from Jaquetta's breast detected DNA that matched the defendant's DNA profile at 6 points of comparison, which was a statistical frequency of 1 in 1,100.

¶ 15    In February 2020, Detective Roesch received the DNA results, and the defendant was arrested. Following the defendant's arrest, the defendant was again interviewed by the police. This interview was also audio and video recorded and played for the jury. At the beginning of the interview, Detective Roesch read the defendant his *Miranda* rights. Detective Roesch then asked the defendant if the defendant understood his rights, and the defendant indicated that he did. Then, in the interview, the defendant indicated that there was a "communication problem" at the first interview. The defendant admitted to having sex with Jaquetta in August 2019 but maintained that he had not forced Jaquetta to have sex. The defendant explained that when he had previously denied having sex with Jaquetta, his intention had been to deny that the sex had been forced.

¶ 16    On cross-examination, Detective Roesch acknowledged that he did not speak French. Detective Roesch also acknowledged that there were times during the September 2019 interview where the defendant appeared to search for words and where the defendant paused and gestured with his hands before answering. Detective Roesch agreed that, during the interview, he repeated a lot of what he thought the defendant had said. Detective Roesch further agreed that the defendant, at times, responded to questions with imperfect or broken English. On redirect examination, Detective Roesch acknowledged that the defendant indicated that the defendant thought having

6

sex had a different meaning in French and that, in French, it could mean hugging or just having fun. However, Detective Roesch noted that the defendant only indicated that the defendant did not understand what "sex" meant after his cheek had been swabbed.

¶ 17    The State then presented evidence that the defendant had made over 200 phone calls to the same phone number while he was in jail. A portion of one of the phone calls was played for the jury. On the phone call, the defendant conversed with the individual in English.

¶ 18    The defendant testified that he had lived in the United States for almost five years and went to college for two months to learn English as a second language. Although he spoke English, he did not speak it perfectly. He maintained that there were times he did not understand what was being asked of him, and he sometimes did not know the English words for things he wanted to say.

¶ 19    The defendant indicated that in August 2019, Jaquetta visited his apartment. The defendant noted that Jaquetta had been drinking that day, and she continued to drink while at his apartment. After they had been hanging out for a while, the two of them began touching and hugging, and they eventually had sex. The defendant maintained that Jaquetta never told him no and never tried to push him off her. The defendant denied holding Jaquetta down. The defendant indicated that there was no reason for Jaquetta to run away because there were no problems between them.

¶ 20    During his first interview with Detective Roesch, the defendant did not understand everything that was said, and there were times where the defendant struggled to explain what he meant in English. The defendant indicated that he did not have an interpreter during the interview. The defendant also indicated that when Detective Roesch asked if he had sex with Jaquetta, and he said no, he believed that Detective Roesch was asking if he forced Jaquetta to have sex. During the second interview with Detective Roesch, the defendant noted that Detective Roesch was

"trying to make [him] accept that [he] forced the girl to have sex." The defendant noted that he was troubled by that and did not know how to react.

¶ 21　　On cross-examination, the defendant explained that he was troubled during the initial interview because Detective Roesch wanted to talk to him about Jaquetta, and he did not understand what it was about. The defendant acknowledged making over 200 phone calls while in jail to a woman with whom he conversed in English. The defendant maintained that when he told Detective Roesch that he and Jaquetta were together for approximately 20 minutes on the day of the incident, he did not fully understand what Detective Roesch was asking him. The defendant explained that if someone did not say no, then that constituted consent. He further explained that if Jaquetta had said no, then he would have let her go. He acknowledged that Jaquetta might have said no in a different way, and he did not understand, but he maintained that she did not say no or pull away from him. He indicated that the encounter was fully consensual and that Jaquetta pulled down her shorts. He asserted that sex in French was not just sexual contact. He denied pulling Jaquetta toward him on the bed, explaining that Jaquetta was voluntarily sitting on the bed.

¶ 22　　On redirect examination, the defendant reiterated that during the first interview with Detective Roesch, the defendant did not understand the distinction between having consensual sex and having sex by the use of force. However, in the second interview, Detective Roesch made the distinction between those clearer.

¶ 23　　Following closing arguments and jury instructions, the jury found the defendant guilty of both counts of criminal sexual assault. However, the jury found him not guilty of criminal sexual abuse. On April 15, 2021, the trial court sentenced the defendant to consecutive prison terms of five years and six months for each offense. Following the sentencing, on April 29, 2021, two letters from the defendant were received and filed in the trial court. In the letters, the defendant made

8

various assertions about how he was not offered a deal regarding sentencing and about the State using improper evidence at his sentencing. After receiving the defendant's letters, the trial court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). At this hearing, the defendant asserted that his trial counsel failed to show him the videos that were used at trial and failed to play him the recordings of the phone calls that he made while incarcerated. The defendant also asserted that his attorney failed to develop evidence that Jaquetta had asked him for money after they had sex.

¶ 24    In response, the defendant's trial counsel indicated that she had reviewed the discovery materials with the defendant on multiple occasions, they had extensively discussed the police interview videos before the trial, and she had reviewed portions of those videos with him on at least one occasion. Counsel acknowledged that the defendant did not hear the recording of the phone call prior to trial, but she explained that she did discuss it with the defendant and told him that it would be played at trial. Also, counsel explained that she did not present the defendant's allegation that Jaquetta had demanded money for sex because she believed it would prejudice the jury against the defendant. Counsel also believed that they had a stronger reason for why Jaquetta would have lied about the assault, *i.e.*, that Jaquetta was afraid that the nursery was going to call DCFS because she was late to pick up her children. After hearing from the defendant and his trial counsel, the trial court found that defense counsel's decision not to pursue the allegation that Jaquetta had demanded money was a sound strategic trial decision and that the other claims made by the defendant lacked merit.

¶ 25    On May 14, 2021, the defendant filed a motion to reconsider his sentence, which the trial court denied on May 20, 2021. On direct appeal, the Fourth District Appellate Court affirmed the

9

defendant's convictions, finding that the evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt. *People v. Nyanguile*, 2022 IL App (4th) 210298-U.

¶ 26 On August 24, 2023, the defendant filed a *pro se* petition for postconviction relief, in which he argued that he spoke insufficient English to voluntarily, knowingly, and intelligently waive his *Miranda* rights. The defendant asserted that he did not understand the nature of the *Miranda* rights or the consequences of waiving them because he was interrogated in English and without an interpreter being present. The defendant asserted that his trial counsel failed to "impeach" this illegally obtained evidence. The defendant also argued that his appellate counsel did not raise this issue because the evidence was outside the record.

¶ 27 The defendant argued that his trial counsel was ineffective for failing to (1) adequately investigate the nursery's policy regarding parents picking up their children late, and whether Jaquetta was actually late in picking up her children on the day in question; (2) review the 9-1-1 call placed by the nursery; (3) show the defendant the police interview videos; and (4) play the defendant the recordings of the phone calls that he made from jail. The defendant also argued that the State failed to disclose police reports, the recording of the 9-1-1 call, and a list of the nursery employees who would have impeached Jaquetta's testimony and provided information about the nursery's policy concerning late pickups.

¶ 28 In addition, the defendant argued that the State knowingly used perjured testimony during the trial, and the trial court failed to advise the defendant before trial of his right to communicate with a consular representative from his native Congo. The defendant also made a claim of actual innocence. Attached to the defendant's *pro se* postconviction petition was, among other things, his August 3, 2023, affidavit, in which he asserted that he did not validly waive his *Miranda* rights, his trial counsel failed to conduct a reasonable investigation of the nursery, trial counsel failed to

10

allow him to watch the police interview videos and to listen to the recorded phone calls, the State committed perjury during closing argument, the trial court failed to notify him that he had a right to communicate with a consular representative, the State failed to disclose material evidence about the consequences of Jaquetta being late to pick up her children from the nursery, and the State failed to disclose the contents of a police report created as a result of the 9-1-1 call.

¶ 29    On November 21, 2023, the trial court entered an order summarily dismissing the defendant's *pro se* postconviction petition. Regarding the defendant's assertion that his *Miranda* rights were violated, the trial court noted that this argument was not raised in a pretrial motion to suppress, during the *Krankel* hearing where the defendant made claims that his trial counsel was ineffective, or in the defendant's direct appeal. The trial court also noted that, prior to the defendant filing his *pro se* postconviction petition, the defendant did not raise ineffective assistance of counsel claims against his trial and/or appellate counsel for failing to raise this argument. Thus, the trial court found that this claim was barred by *res judicata* and that the defendant failed to state the gist of a constitutional claim on this issue.

¶ 30    Despite the trial court's finding regarding the application of *res judicata*, the trial court addressed the merits of the defendant's claim. The trial court noted that the defendant failed to specify whether the *Miranda* violation occurred during the defendant's first or second police interview. However, the trial court noted that the first interview was a consensual encounter with the police where the defendant was advised that he was free to leave at any time, the door to the interview room was unlocked, and the defendant was advised that he was not under arrest. Thus, the trial court found that the first interview was noncustodial, and Detective Roesch was under no obligation to give the defendant his *Miranda* warnings. However, the trial court noted that although the first interview was noncustodial, at some point during the interview, Detective Roesch read the

11

defendant his *Miranda* warnings "to err on the side of caution" because Detective Roesch did not believe that the defendant was being truthful during the interview. The trial court then noted that the second interview occurred after the defendant was arrested, Detective Roesch immediately read *Miranda* warnings to the defendant, and the defendant indicated that he understood his *Miranda* rights. Thus, the trial court found that the defendant's assertion that the entirety of the *Miranda* warnings was not read to him was directly contradicted by the record.

¶ 31 The trial court then indicated that, at the time of the proceedings, the defendant had been in the United States for approximately five years, and he attended a college level English as a second language course. The trial court noted that the defendant met Jaquetta at work, and they solely communicated in English. Also, the trial court noted that the defendant made over 200 telephone calls while in jail, and the entirety of the phone calls were in English. The trial court further noted that Detective Roesch was aware that English was the defendant's second language, and during the interview, the defendant was instructed to let Detective Roesch know if the defendant had difficulty understanding anything during the interview. However, the defendant never indicated that he had trouble understanding the *Miranda* rights that were read to him. Thus, the trial court found that the defendant intelligently waived his *Miranda* rights and failed to state the gist of a constitutional claim with regard to this issue. In addition, the trial court found that the defendant failed to state the gist of a constitutional claim regarding the remaining claims asserted in his *pro se* postconviction petition. The defendant appeals.

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, the defendant's only argument is that the trial court erred in summarily dismissing his postconviction petition because it stated the gist of a claim of ineffective assistance of trial counsel where counsel failed to challenge the admission of the defendant's second video-

12

recorded statement to police based on a violation of his *Miranda* rights. The Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a means for a defendant to collaterally attack his conviction or sentence for federal or state constitutional violations. *People v. Petrenko*, 237 Ill. 2d 490, 496, 499 (2010). The Act establishes a three-stage process for adjudicating a postconviction petition. *People v. Tate*, 2012 IL 112214, ¶ 9. At the first stage of the postconviction proceedings, the trial court must independently review the petition and determine, without any input from the State, whether the defendant's petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022); *Tate*, 2012 IL 112214, ¶ 9. At this stage, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). A postconviction petition may be summarily dismissed as frivolous or patently without merit if the petition has no arguable basis either in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition that lacks an arguable basis either in law or in fact is one that is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id.* at 16.

¶ 34　At the first stage, the trial court acts in an administrative capacity and screens out postconviction petitions that lack legal substance or are obviously without legal merit. *Tate*, 2012 IL 112214, ¶ 9. To avoid dismissal at this stage, the defendant need only present the gist of a constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The "gist" standard is a low threshold that requires the postconviction petition to contain only a limited amount of detail. *Id.* The summary dismissal of a postconviction petition at the first stage is reviewed *de novo*. *Hodges*, 234 Ill. 2d at 9. In postconviction proceedings, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been but were not presented are forfeited. *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).

13

¶ 35    In determining whether defendant has asserted an arguable claim of ineffective assistance of counsel, we are guided by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). *Hodges*, 234 Ill. 2d at 17. To prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant. *Petrenko*, 237 Ill. 2d at 496. At the first stage of the postconviction proceedings, a petition alleging ineffective assistance may not be summarily dismissed if it is arguable that counsel's performance fell below an objective standard of reasonableness, and it is arguable that the defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17.

¶ 36    Here, in his *pro se* postconviction petition, the defendant asserted that he spoke insufficient English to voluntarily, knowingly, and intelligently waive his *Miranda* rights and that he did not understand the nature of the *Miranda* rights or the consequences of waiving them because he was interrogated in English and without an interpreter being present. He also asserted that his trial counsel failed to "impeach illegally obtained evidence" and that his appellate counsel did not raise this issue because the evidence was outside the record. In his appellate briefs, the defendant acknowledges that his assertion that his trial counsel failed to "impeach" this illegally obtained evidence is not synonymous with asserting that his trial counsel was ineffective for failing to file a motion to suppress his postarrest statements. In other words, the defendant admits that arguing that his trial counsel failed to "impeach" his postarrest statements was not the "correct legal vehicle" to challenge the admission of his statements based on a *Miranda* violation. However, the defendant argues that his intention in his *pro se* postconviction petition was clear, *i.e.*, to challenge the admission of his postarrest statements based on a violation of *Miranda* rights.

14

¶ 37 Allegations made in a *pro se* postconviction petition at the first stage of the postconviction proceedings are to be liberally construed in favor of the defendant. *Coleman*, 183 Ill. 2d at 382. Thus, we conclude that the relevant argument in the defendant's *pro se* postconviction petition can reasonably be construed as arguing that his trial counsel was ineffective for failing to challenge the admission of his postarrest statements based on a *Miranda* violation. In making this decision, we note that the State does not challenge this construction of the defendant's postconviction argument.

¶ 38 However, the State does challenge the defendant's postconviction claim based on forfeiture. Specifically, the State contends that the defendant forfeited the postconviction claim of ineffective assistance of counsel based on a *Miranda* violation because the defendant could have raised this issue on direct appeal but failed to do so. The State argues that the defendant's claim was not based on facts outside the record, that the defendant has not supported his claim with any evidence that was not included in the direct appeal record, and that the defendant does not argue that his appellate counsel was ineffective for failing to raise the claim on direct appeal. In response, the defendant contends that his claim was not forfeited because it could not have been raised on direct appeal. In making this argument, the defendant acknowledges that the record on appeal contains "clues" that the defendant had difficulty understanding the *Miranda* warnings. However, the defendant contends that his assertion that he was, in fact, unable to understand the *Miranda* warnings was not contained in the record on direct appeal. In addition, the defendant asserts that there is nothing in the record on appeal regarding defense counsel's decision not to file a motion to suppress the defendant's postarrest statements based on the defendant's inability to understand the *Miranda* warnings.

15

¶ 39 The only argument that the defendant raised on direct appeal was that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Thus, the State is correct that the argument concerning the validity of the defendant's *Miranda* waiver was not presented in the direct appeal. We also note that this argument was not raised during the *Krankel* hearing when the defendant presented his various claims as to how his trial counsel was ineffective. However, as the record on direct appeal did not specifically contain the defendant's assertion that he was unable to understand the *Miranda* warnings as read to him in English, or any explanation as to why this argument was not previously raised by his trial counsel, we will address the defendant's argument despite any potential forfeiture. See *People v. English*, 2013 IL 112890, ¶ 22 (a defendant's forfeiture of an issue is relaxed where the facts relating to the issue do not appear on the face of the original appellate record).

¶ 40 *Miranda* provides that a suspect is constitutionally entitled to the assistance of counsel and to remain silent during a custodial interrogation. *Miranda*, 384 U.S. at 478-79; *People v. Goins*, 2013 IL App (1st) 113201, ¶ 48. "Any statements obtained in derogation of those rights are inadmissible in a later criminal prosecution unless those rights were voluntarily, knowingly, and intelligently waived." *Goins*, 2013 IL App (1st) 113201, ¶ 48. A defendant validly waives his *Miranda* rights when he (1) freely and deliberately (voluntarily) relinquishes the right and (2) is fully aware of both the nature of the right being abandoned and the consequences of the decision to do so. *Id.* Thus, a valid waiver requires both an uncoerced choice and the requisite level of comprehension. *People v. Bernasco*, 138 Ill. 2d 349, 354 (1990).

¶ 41 Whether a defendant knowingly and intelligently waived his *Miranda* rights is a question of fact to be determined in light of the totality of the circumstances. *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 39. Among the factors to be weighed in this decision are the defendant's

16

intellectual ability; his familiarity with English; and his age, education, and experience. *Id.* The defendant need not understand the far-reaching legal and strategic effects of waiving his rights; instead, the defendant must, at a minimum, understand basically what those rights encompass and what his waiver will entail. *Id.*

¶ 42    Here, we conclude that the defendant's allegation that, due to his limited English skills, he was unable to voluntarily, knowingly, and intelligently waive his *Miranda* rights is positively rebutted by the record. During the defendant's September 16, 2019, noncustodial interview with Detective Roesch, the defendant indicated that he spoke French, but English was his second language. The defendant indicated that he did not need an interpreter for the interview, and he spoke English throughout the entire interview. At some point during the interview, Detective Roesch, believing that the defendant was being dishonest, read the defendant the *Miranda* rights and asked the defendant if he understood after each one was read. The defendant indicated that he understood each one. Then, at the beginning of the defendant's second interview in February 2020, which was again with Detective Roesch, Detective Roesch immediately advised the defendant of his *Miranda* rights, and the defendant indicated that he understood those rights. The defendant never requested an interpreter for the interview, again spoke in English throughout the interview, and never indicated that he had difficulty understanding his *Miranda* rights or difficulty understanding Detective Roesch during the interview.

¶ 43    Additionally, in addressing the sufficiency of the evidence on direct appeal, the Fourth District noted in its August 26, 2022, order that there was evidence presented that suggested the defendant could effectively understand and communicate in English. *People v. Nyanguile*, 2022 IL App (4th) 210298-U. In support of this conclusion, the Fourth District noted that Jaquetta testified that she only spoke English and had no problems communicating with the defendant, and

the defendant also made telephone calls from the jail in which he conversed in English with the person he called. Also, the Fourth District noted that, at the time of the initial police interview, the defendant reported that he understood English and did not need an interpreter. Further, at trial, the defendant testified that he had lived in the United States for almost five years and went to college for two months to learn English as a second language.

¶ 44 Based on the above, we find that the record demonstrates that the defendant had a sufficient understanding of the English language to voluntarily, knowingly, and intelligently waive his *Miranda* rights. In making this decision, we find that the fact that the defendant had the aid of an interpreter during the trial court proceedings does not require the conclusion that he did not understand his *Miranda* rights as read to him in English. As explained above, the defendant does not need to understand the far-reaching legal and strategic effects of waiving his *Miranda* rights. *Pabello*, 2019 IL App (2d) 170867, ¶ 39. Rather, at a minimum, the defendant must understand basically what those rights encompass and what his waiver will entail. *Id.* After carefully reviewing the record, we conclude that the record demonstrates that the defendant understood English well enough to understand what the *Miranda* rights encompass and what his waiver would entail. Thus, we find that the defendant's postconviction petition was properly dismissed where the defendant failed to set forth an arguable claim of ineffective assistance of counsel based on trial counsel's failure to file a motion to suppress the defendant's postarrest statements. Accordingly, we affirm the first stage dismissal of the defendant's *pro se* postconviction petition.

¶ 45                                    III. CONCLUSION

¶ 46 For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

¶ 47 Affirmed.

18